THE STATE OF NEVADA, Appellant, *v.*
ROOSEVELT JONES, JR., Respondent.

No. 25565

THE STATE OF NEVADA, Appellant, *v.*
RICKY H. DOLLAR, Respondent.

No. 25576

May 25, 1995                                    895 P.2d 643

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Appellants.

*Morgan D. Harris,* Public Defender and *Daren B. Richards,* Deputy Public Defender, Clark County, for Respondents.

## OPINION

*Per Curiam:*

These are consolidated appeals from orders of the district court granting respondents' motions to suppress evidence. Each of the two respondents, while on the streets of Clark County, was arrested by Las Vegas Metropolitan Police Department ("LVMPD") officers for being under the influence of cocaine. Each respondent was then taken to the Clark County Detention Center and, after refusing to submit to a blood or urine test, was

forced to give blood. LVMPD officers did not obtain warrants for the seizure of this blood.

The respondents were subsequently charged with being under the influence of a controlled substance, a felony under NRS 453.411. Thereafter, they filed motions to suppress all evidence relating to the blood tests. At hearings regarding the warrantless seizure of the respondents' blood, the state presented evidence that cocaine may be reduced by half in an individual's blood system within forty-five minutes, and that on the average, cocaine dissipates in the bloodstream within four hours. The state's toxicology expert opined that one of cocaine's metabolites, benzoylecgonine, may be detectable in the blood for approximately four to six hours beyond the detection period for cocaine. A criminalist with the LVMPD forensic laboratory, however, testified that benzoylecgonine remains in the bloodstream for as many as twelve hours after cocaine dissipates. In addition, respondents cited an article that allegedly specifies five days as the period during which cocaine's metabolites may be detected. It is not clear, however, whether this article refers to blood tests or urine tests.

After considering the parties' arguments, the district court granted the respondents' motions to suppress. On appeal, the state asserts that under Schmerber v. California, 384 U.S. 757 (1966), it was entitled to withdraw blood from each respondent without a warrant and test it for the presence of cocaine and its metabolites. In *Schmerber,* the Supreme Court concluded that the warrantless seizure of a DUI suspect's blood was justified because the percentage of alcohol in the blood begins to diminish shortly after drinking stops and because police officers had to spend time investigating the accident scene and taking the suspect to the hospital. *Id.* at 770-71.

We are not convinced that *Schmerber* applies in the present circumstances. An intrusion into a suspect's body constitutes a ''search'' as contemplated by the Fourth Amendment. *Schmerber,* 384 U.S. at 767. The Fourth Amendment mandates that a warrant be obtained before such a search is initiated. Katz v. United States, 389 U.S. 347, 357 (1967). One exception to this warrant requirement occurs when exigent circumstances are present. United States v. Salvador, 740 F.2d 752, 758 (9th Cir. 1984), *cert. denied,* 469 U.S. 1196 (1985). Here, however, the circumstances were not sufficiently exigent to justify a warrantless search.

As respondents point out, the considerations involved when a person is suspected of driving under the influence are different than those involved when a person is suspected of merely being under the influence of a controlled substance. In a driving-under-the-influence case, the legislature has provided that

[a] person who drives . . . within this state shall be deemed
to have given consent to the taking of his blood, urine,
breath or other bodily substance for the purpose of testing
those substances to determine his alcohol concentration or to
detect the presence of a controlled substance in his system.

NRS 483.922.

Thus, a driver suspected of intoxication may be forced to give
a blood or urine sample. The implied consent theory, however,
does not apply in cases like these, where suspects are arrested on
the street. In addition, a conviction for driving under the influ-
ence requires a specific minimum concentration of blood alcohol,
whereas a conviction for being under the influence of a*controlled
substance requires only a trace amount of the substance or its
metabolites. See NRS 453.411; NRS 484.379. Further, the dissi-
pation rate for cocaine and its metabolites appears significantly
slower than the dissipation rate for alcohol. Finally, intoxicated
pedestrians do not present the serious public safety hazard that
results from drunk drivers.

Although cocaine and its metabolites dissipate over time, the
state will not necessarily lose its evidence and its opportunity to
convict a suspect if it is required to obtain a warrant before
withdrawing a suspect's blood. According to the hearing testi-
mony, the state has, at the very least, six to fourteen hours after
cocaine is ingested before the cocaine and its metabolites dissi-
pate. In addition, the state may produce evidence of a suspect's
outward symptoms of cocaine use in establishing that the suspect
was under its influence.

Although the state asserts that obtaining a search warrant in
Clark County requires more than six hours, this alleged delay
does not justify the violation of a suspect's Fourth Amendment
rights. Under this reasoning, the slower the jurisdiction is to
issue search warrants, the more "exigent" circumstances arise,
and the fewer warrants are needed. The Fourth Amendment is
simply not susceptible to this type of reasoning.

In short, the state has not met its "'heavy burden of demon-
strating that exceptional circumstances justified a departure from
the normal procedure of obtaining a warrant.'" United States v.
Alvarez, 810 F.2d 879, 881 (9th Cir. 1987)(quoting United States
v. Driver, 776 F.2d 807, 810 (9th Cir. 1985)). Accordingly, we
affirm the district court's orders granting respondents' motions to
suppress evidence.

STEFFEN, C. J., concurring:

I have elected to write separately to register my objection to the
exclusionary rule, properly acknowledged in the Majority's opin-
ion, solely for the purpose of swelling the chorus of voices who

find the exclusionary rule ill-advised and an anathema to a civilized society. Moreover, I agree with the result reached by the Majority, as I do not find exigent circumstances similar to those in *Schmerber* involving rapidly dissipating alcohol. Under existing law, the affirmance is warranted absent the finding of a good faith exception under United States v. Leon, 468 U.S. 897 (1984). Since the State has not raised the issue of a *Leon* exception, I am forced to concur with the Majority's affirmance, and I will accordingly limit my brief comments to the exclusionary rule.

Rather than re-express views that I have already published on the subject, I will take the liberty of quoting from a segment of my article published in Volume 1988, Number 4 of the Utah Law Review entitled *Truth as Second Fiddle: Reevaluating the Place of Truth in the Adversarial Trial Ensemble.*

> If persons and places are subject to unconstitutional searches and seizures that reveal criminal enterprise, two discrete consequences should follow. First, criminal prosecution should be unimpeded by the exclusion of evidence. Illegal searches and seizures have no bearing on the guilt or innocence of an accused. Second, punitive measures should be taken against law enforcement agents who willfully and in bad faith fail to respect fourth amendment constraints. If these procedures are adopted, facts revealed by searches and seizures will be preserved and used in the accountability process. And the parties who disregard fourth amendment imperatives will suffer appropriate punishment.
>
> . . . .
>
> Many contend that the [United States Supreme] Court has saddled society with a convoluted formula for dealing with fourth amendment violations. It is easy to envision a scenario where the true malefactor receives a windfall and the police who violate the constitutional standard are unperturbed as they continue earning their daily bread. In this scenario, it is the public that receives the lash. [Former Utah Supreme Court Justice and law professor Dallin H.] Oaks persuasively stated: "Only a system with limitless patience with irrationality could tolerate the fact that where there has been one wrong, the defendant's, he will be punished, but where there have been two wrongs, the defendant's and the officer's, both will go free."[1] And to that I add the postscript that only society will be wounded. This undoubtedly explains why apparently no other nation has emulated our

---

[1] Dallin H. Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U. Chi. L. Rev. 665, 755 (1970).

folly.[2] I offer nothing original, but provide this reminder in the hope that a continuing dialogue will eventually wrest the country from a firmly fastened millstone that was manufactured without constitutional cement or labor.

Justice Powell supplied thematic context for this aspect of this Article's thesis when he wrote:

> The costs of applying the exclusionary rule even at trial and on direct review are well known . . . the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant . . . . *Application of the rule thus deflects the truth-finding process and often frees the guilty.* The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice.[3]

Truth and criminal accountability are the primary victims of the exclusionary rule. Today, however, a sense of urgency attaches to this particular obstacle to truth. The enormity of the nation's current drug problem cannot be overstated, and no one knows the true dimension of its present and future cost in lives, human potential, and material well being. The drug industry thrives in the dark and constantly expands the inventory of hiding places essential to the manufacture, transportation, and distribution of illegal drugs. Even our elementary school children suffer from this evil. Society no longer can afford laws akin to fiddlers preoccupied with dissonance while the drug industry runs wild. Evidence of crime, no matter how obtained, must find no haven behind the fourth amendment. Police officers who consider themselves above constitutional restraint must pay a price commensurate with their offense, thereby perpetuating a vigorous respect for our fundamental law.

Aside from the fact that the exclusionary rule fails to deter police impropriety,[4] and provides a motive for police perjury,[5] its mischief proliferates as a result of expansive judicial interpretation.

---

[2]Malcolm R. Wilkey, *The Exclusionary Rule: Why Suppress Valid Evidence?*, 62 Judicature 214, 216 (1978).

[3]Stone v. Powell, 428 U.S. 465, 489-90 (1976) (citations omitted; emphasis added).

[4]*See* Oaks, *supra* note 1, at 755.

[5]*Id.*

Thomas L. Steffen, *Truth as Second Fiddle: Reevaluating the Place of Truth in the Adversarial Trial Ensemble,* 1988 Utah L. Rev. 788, 831-33 (1988) (footnotes modified).

In summary, the exclusionary rule fails to deter police misconduct, provides incentive for police perjury, and suppresses the most reliable evidence of guilt. It also immunizes criminals from accountability and conviction, punishes society, and frustrates citizens who are growing increasingly weary and impatient over the criminal justice system. I suggest that reason and common sense demand the long overdue elimination of this jurisprudential aberration.