**STATE of Arizona, Appellee,**

v.

**Billy Joe FLANNIGAN, Appellant.**

**No. 1 CA–CR 97–0763.**

Court of Appeals of Arizona, Division 1, Department A.

Nov. 3, 1998.

Reconsideration Denied Dec. 4, 1998.

Review Denied May 26, 1999.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Division

---

and Gregory A. McCarthy, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Christopher V. Johns, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

GERBER, Judge.

¶ 1   Billy Joe Flannigan ("Flannigan") appeals his convictions and sentences for negligent homicide, aggravated assault and endangerment.   Because we conclude that the trial court erred in denying his motion to suppress the results of a warrantless blood test, we reverse Flannigan's convictions and remand to the trial court for further proceedings.

## FACTS [1]

¶ 2   The charges against Flannigan arise from an automobile accident in Mesa, Arizona on August 18, 1994.   The undisputed evidence at trial established that he drove a flatbed tow truck through a red light and struck another automobile in the intersection, killing the driver of the other vehicle and injuring her two teenage passengers, one of them seriously.

¶ 3   The paramedics who treated Flannigan after the accident observed that both his blood pressure and pulse rate were high. When they tested him again approximately twenty-five minutes later, both rates remained high.   They also observed that he was very nervous throughout the time that they attended him.

¶ 4   After conferring with the paramedics, Mesa Police Officer Ron Martinez spoke to Flannigan.   Martinez, a certified drug recognition expert, noticed that he was "jittery" and manifested finger tremors.   With Flannigan's consent, Martinez had another officer drive him to the police station so that he could perform a series of field sobriety tests.

¶ 5   Martinez met Flannigan at the station and read him his *Miranda* warnings.[2]   Beginning at 12:54 p.m., approximately one and one-half hours after the accident, Officer Martinez began a Drug Recognition Evaluation ("DRE") of Flannigan.   Pursuant to a policy of the Mesa Police Department which required that two drug recognition experts participate in all DREs, Sergeant Patricia Bradley also observed the evaluation.   The DRE consisted of several tests of his physical coordination, a breath test, and a horizontal gaze nystagmus ("HGN") test.   It also included repeated monitoring of his pulse rate, blood pressure and temperature, all of which remained elevated throughout the evaluation.   Additionally, the officers observed that Flannigan's nostrils were red, a possible indication that he had ingested a drug.   He told the officers that he had taken four Vivarin tablets at approximately 7:00 p.m. the previous evening and that he had consumed three 52–ounce drinks of Mountain Dew or Coca–Cola the morning of the accident.

¶ 6   Believing that Flannigan was under the influence of a central nervous system stimulant, Officer Martinez arrested him and requested that he give a blood sample.   The record does not indicate that he consented, nor did Officer Martinez or Sergeant Bradley obtain a warrant for the blood draw.   Nevertheless, a phlebotomist drew his blood at the Mesa police station at 1:52 p.m. A toxicology screen detected the presence of amphetamine and methamphetamine in his blood.

¶ 7   The Maricopa County Grand Jury subsequently indicted Flannigan on one count each of reckless manslaughter, aggravated assault pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 13–1204(a)(2) upon a victim under fifteen years of age, and endangerment.   A jury convicted him of aggravated assault, endangerment and negligent homicide as a lesser-included

---

1.   We view the facts underlying Flannigan's convictions in the light most favorable to sustaining the jury's verdicts.   *State v. Atwood*, 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

2.   *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

offense of manslaughter. The jury also found each felony to be a dangerous offense involving the use of a motor vehicle as a dangerous instrument in violation of A.R.S. section 13–604(P) (1994).

¶ 8 The trial court sentenced him to mitigated, concurrent terms of 4.5 years for negligent homicide, 7.5 years for aggravated assault and 2 years for endangerment.[3] He timely appealed his convictions and sentences to this court. We have jurisdiction over his appeal pursuant to article VI, section 9 of the Arizona Constitution and A.R.S. sections 12–120.21 (1992), 13–4031 (1989), and 13–4033(A)(Supp.1997).

## DISCUSSION

### I. MOTION TO SUPPRESS BLOOD TEST RESULTS

¶ 9 Prior to trial, Flannigan moved to suppress the results of his blood test, arguing that the warrantless seizure of his blood violated the Fourth Amendment because it was non-consensual and not otherwise justified by the presence of exigent circumstances. Officer Martinez and Sergeant Bradley testified at the suppression hearing that Flannigan's DRE indicated that he was under the influence of a central nervous system stimulant. Pursuant to Mesa Police Department procedure in all traffic accident cases involving serious injury or death, the officers did not attempt to obtain a warrant before conducting the blood draw. Instead, they relied on the department's policy that exigent circumstances always exist in vehicular aggravated assault and manslaughter cases. They conceded that it was possible to obtain a telephonic search warrant in fifteen to forty-five minutes, although the process can take longer.

¶ 10 Thomas Simonick, the Mesa Police Department criminalist who tested Flannigan's blood sample, testified that drugs, like alcohol, are evanescent in a person's blood system. Cocaine remains in the blood system for less time than alcohol, while metham-

phetamine remains in the blood for a longer period than alcohol. Specifically, methamphetamine has a half-life in blood of six to fifteen hours, while cocaine's half-life in blood is one to two hours. Methamphetamine metabolites, however, may be detected in urine for approximately twenty-four to forty-eight hours and cocaine metabolites may be detected in urine for approximately twelve to twenty-four hours. According to Simonick, it is impossible to tell by observing whether a person is under the influence of cocaine or methamphetamine. He also testified that, if a person is exhibiting physical symptoms caused by a stimulant (as Flannigan did throughout the DRE), a delay of fifteen to forty-five minutes in obtaining a blood sample probably would not preclude a criminalist from detecting evidence of the stimulant in the blood.

¶ 11 The trial court denied Flannigan's motion to suppress, concluding that the blood draw was constitutionally reasonable under the exigent circumstances exception to the warrant requirement, as that exception is explained in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). He maintains that the trial court erred in this conclusion.

¶ 12 In reviewing the denial of Flannigan's motion to suppress, we must defer to the trial court's factual findings absent an abuse of discretion. *State v. Rogers*, 186 Ariz. 508, 510, 924 P.2d 1027, 1029 (1996). We review *de novo* the ultimate issue whether the warrantless blood draw complied with the dictates of the Fourth Amendment. *See id., see also State v. Blackmore*, 186 Ariz. 630, 632, 925 P.2d 1347, 1349 (1996); *see Schmerber*, 384 U.S. at 767, 86 S.Ct. 1826 (taking of blood sample is a search subject to the warrant requirement of fourth amendment).

¶ 13 At the outset, we note that this case does not involve an application of the Arizona implied consent statute in effect at the time

---

3. The record indicates that, despite the jury's findings of dangerousness as to all offenses, the trial court failed to impose the enhanced sentencing provisions of A.R.S. § 13–604(F) and (I). The state, however, did not cross-appeal from the

sentence imposed, and we therefore do not address the propriety of those sentences in this decision. *See State v. Dawson*, 164 Ariz. 278, 286, 792 P.2d 741, 749 (1990).

of the arrest. *See* A.R.S. § 28–691 (1994). The implied consent statute in effect in 1994 would have applied only if the police had arrested Flannigan for a violation of the Uniform Act Regulating Highway Traffic, *see* A.R.S. Title 28, Chapter 6. *See* A.R.S. § 28–691(A) (1994). He was arrested for violating provisions of Title 13 of the Arizona Revised Statutes, not Title 28.

¶ 14 Similarly, because he did not sustain any injuries in the accident that required medical personnel to draw his blood, this case does not involve the medical purposes exception of A.R.S. section 28–692(J), which would have entitled the police to receive a sample of his blood regardless of his consent. *See* A.R.S. § 28–692(J) (1994); *see also Lind v. Superior Court,* 191 Ariz. 233, 236, 954 P.2d 1058, 1061 (App.1998).

¶ 15 The state argues for the first time on appeal that the warrantless seizure of Flannigan's blood was constitutionally permissible because he consented to it. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)(consent to search constitutes exception to warrant requirement); *State v. Groshong,* 175 Ariz. 67, 70–71, 852 P.2d 1251, 1254–55 (App. 1993). The state waived this argument for purposes of appeal because it never attempted to prove consent at the suppression hearing.

■ ¶ 16 Moreover, even absent waiver, we would reject the state's argument because the record lacks evidence of Flannigan's actual consent to the blood draw. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (citations omitted); *see also* Ariz. R.Crim. P. 16.2(b)("The prosecutor shall have the burden of proving, by a preponderance of the evidence, the lawfulness in all respects of the acquisition of all evidence which the prosecutor will use at trial."). At most, the record demonstrates only that Flannigan never expressly refused to submit to the blood

draw. This evidence is insufficient to demonstrate actual consent.

■ ¶ 17 Absent express consent to the blood draw, the police would have been entitled to conduct the warrantless seizure of his blood only if (1) they had probable cause to believe that he had been operating his vehicle while under the influence of drugs, and (2) exigent circumstances justified dispensing with the warrant requirement. Because we conclude that the state failed to prove exigent circumstances, we hold that the police violated Flannigan's Fourth Amendment rights when they conducted the warrantless blood draw.

¶ 18 The United States Supreme Court first recognized the "exigent circumstances" exception to the warrant requirement in upholding the warrantless seizure of a DUI suspect's blood in *Schmerber v. California.* 384 U.S. at 770–72, 86 S.Ct. 1826. The defendant in *Schmerber* was charged with driving while under the influence of alcohol. *Id.* at 758, 86 S.Ct. 1826. The police arrested him while he was receiving treatment at a hospital for injuries he sustained in an automobile accident. *Id.* Without first obtaining a warrant or consent from the defendant, the police directed the treating physician to draw a sample of the defendant's blood for purposes of measuring his blood alcohol content.

¶ 19 In upholding the validity of the warrantless search, the Supreme Court concluded that the police had probable cause to believe that the defendant had been driving while under the influence of alcohol. The critical question was whether the police acted reasonably in obtaining the blood sample without a warrant. The Court's reasoning for permitting a warrantless search in that case is helpful here:

> The officer in the present case … might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened "the destruction of evidence," *Preston v. United States,* 376 U.S. [364], 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as

the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, *there was no time to seek out a magistrate and secure a warrant. Given these special facts,* we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

384 U.S. at 770–71, 86 S.Ct. 1826 (emphasis added).

¶ 20  In *Schmerber,* exigent circumstances existed because of the evanescent quality of alcohol *and* because the police reasonably believed that they did not have time to "seek out a magistrate and secure a warrant" before evidence of the defendant's intoxication would be destroyed. *Schmerber* does not provide a blanket exception to the warrant requirement whenever a suspect is believed to be under the influence of alcohol or drugs. Rather, the evanescent quality of alcohol and drugs in a person's body creates an exigency only if the evidence might disappear before the police can obtain a warrant. The Court emphasized this point in *Schmerber:*

> It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid minor intrusions into an individual's body under stringently limited circumstances in no way indicates that it permits more substantial intrusions, *or intrusions under other conditions.*

384 U.S. at 772, 86 S.Ct. 1826 (emphasis added).

¶ 21  The record does not suggest that the police reasonably believed that evidence of Flannigan's drug consumption would disappear from his system before they could obtain a warrant. Rather, as the officers readily admitted, they did not seek a warrant because they had been instructed that exigent circumstances *always* exist in vehicular manslaughter or aggravated assault cases in which a person is suspected of driving under the influence of drugs or alcohol. This is not the rule of *Schmerber.*

¶ 22  The record establishes that the Mesa Police Department is able to obtain a warrant within as little as fifteen minutes and that delays of only fifteen to forty-five minutes are commonplace. Nevertheless, believing that a warrant was not required, neither Officer Martinez nor Sergeant Bradley made any attempt to obtain a telephonic warrant. Flannigan still manifested physical symptoms of methamphetamine or cocaine consumption when the officers completed the DRE. The Mesa Police Department's criminalist testified that a delay of fifteen to forty-five minutes in obtaining a blood sample probably would not have precluded a criminalist from detecting evidence of the stimulant in his blood.

¶ 23  We recognize the possibility that the police might have encountered longer delays had they attempted to obtain a warrant and that the evidence does not prove conclusively that a warrant would have issued in fifteen to forty-five minutes. We do not know how long the delay would have been because the police made no effort whatsoever to obtain a warrant. The mere possibility of delay does not give rise to an exigency. By contrast, if the police had attempted to obtain a warrant but had encountered difficulties in reaching a magistrate, this change in circumstances might well have created an exigency justifying the warrantless seizure of defendant's blood.

¶ 24  Of course, a blood test was not the only viable method by which the police could have obtained evidence of Flannigan's drug use. The suppression hearing testimony revealed that methamphetamine and cocaine use can be detected in a suspect's urine for as long as twelve to forty-eight hours after ingestion. Although the record does not indicate whether urinalysis would have enabled a criminalist to determine the precise amount of drugs in his system when the accident occurred, such evidence would not have been necessary to convict him of the charged crimes.

¶ 25  In any event, having conducted the fact-intensive analysis *Schmerber* requires, we conclude that the state did not meet its burden of proving the presence of exigent

circumstances. The officers' rote application of the department's untenable policy that exigent circumstances always exist in vehicular manslaughter and aggravated assault cases violated Flannigan's right to be free from unreasonable search and seizure. The trial court therefore erred in refusing to suppress the results of the blood test.[4]

## II. CLASS 2 FELONY AGGRAVATED ASSAULT

¶ 26  Flannigan also argues that the trial court erred in its interpretation of A.R.S. section 13–1204(B) when it sentenced him for aggravated assault as a class 2, rather than a class 3, felony. Although we reverse his convictions, we address this additional issue because it may arise again in the new trial.

¶ 27  The state indicted him for aggravated assault as a class 2 felony, and the trial court sentenced him accordingly. Although he failed to raise the issue before the trial court, he argues on appeal that, whenever a defendant is convicted of aggravated assault involving reckless, as opposed to intentional or knowing, conduct, section 13–1204(B) imposes an arbitrary enhancement of the defendant's punishment. Specifically, section 13–1204(B) provides that an aggravated assault involving serious physical injury or the use of a deadly weapon or dangerous instrument is a class 3 felony, unless the victim of the assault is under the age of fifteen, in which case the assault is a class 2 felony.

¶ 28  Relying on the Arizona Supreme Court's decision in State v. Williams, 175 Ariz. 98, 854 P.2d 131 (1993), Flannigan argues that it was simply fortuitous that passengers in the vehicle he struck were under the age of 15, and that it is therefore irrational to increase the felony classification for the aggravated assault solely because of this fact. In Williams, the court examined the application of the Dangerous Crimes Against Children statute, A.R.S. § 13–604.01, to offenses involving reckless conduct. The defendant in Williams was convicted of aggra-

vated assault for recklessly causing physical injury using a dangerous instrument. Id. at 99, 854 P.2d at 132. Williams, like this case, involved a DUI accident resulting in injury to a child under the age of fifteen. Id. Reversing the trial court's application of the section 13–604.01 sentencing enhancement, the supreme court concluded that the defendant's reckless aggravated assault was not a "dangerous crime against children." Id. at 104, 854 P.2d at 137.

¶ 29  The court reasoned that the legislative history of the statute indicated "quite clearly that the enactment of § 13–604.01 was calculated to reach criminals who prey specifically upon children." Id. at 102, 854 P.2d at 135. Thus, to qualify as a dangerous crime against children, "the defendant's conduct must be focused on, directed against, aimed at, or target a victim under the age of fifteen." Id. at 103, 854 P.2d at 136. In Williams, because the defendant's recklessness in driving drunk was not "directed at or focused upon" the young victim, the court concluded that the offense was not a dangerous crime against children. Id. at 104, 854 P.2d at 137.

¶ 30  The state alleged that Flannigan's aggravated assault against the fourteen-year-old victim was a class 2 felony pursuant to A.R.S. section 13–1204(B), not that the offense was a dangerous crime against children pursuant to section 13–604.01. He argues that, because the age of his victim was a factor beyond his control, the reasoning of Williams should similarly apply to preclude the trial court from sentencing him for a class 2, rather than a class 3, felony. We disagree.

¶ 31  As the court observed in Williams, "punishment can vary according to the severity of the consequences flowing from an individual's conduct as well as from the culpability of the conduct, and the legislature could consider harming a child, even fortuitously, more serious than harming an adult." 175 Ariz. at 103, 854 P.2d at 136 (emphasis add-

---

4.  We base our conclusion, as we must, solely on the record in this case. For cases applying similar fact-intensive applications of Schmerber in the context of cocaine/methamphetamine use and likewise finding no exigent circumstances, see

State v. Jones, 111 Nev. 774, 895 P.2d 643, 644 (Nev.1995); United States v. Pond, 36 M.J. 1050, 1058–59 (U.S. Air Force Ct. of Military Rev. 1993); State v. Moylett, 313 Or. 540, 836 P.2d 1329, 1335–36 (Oregon 1992).

**156**

ed). The court noted that the legislature approved this reasoning by converting aggravated assault from a class 3 felony to a class 2 felony whenever the victim is under fifteen. *Id.*

¶ 32 Flannigan argues in response that "[t]here is no deterrent effect if his conduct is punished more severely based on chance." He may well be correct. Criminal punishment, however, is not imposed solely for its deterrent effect. To a limited extent, it also serves a retributive function. The legislature's decision to increase the felony classification for aggravated assaults upon victims under fifteen is consistent with a retributive theory of criminal punishment. *See* Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law,* § 1.5(6), at 35–36 (1986). As the court observed in *Williams,* the legislature thus had a legitimate basis for classifying aggravated assaults upon victims under the age of fifteen as class 2, rather than class 3, felonies. We therefore reject his argument that the trial court erred in sentencing him for a class 2 aggravated assault.[5]

## CONCLUSION

¶ 33 Because we conclude that the trial court erred in denying Flannigan's motion to suppress the blood test results, we reverse his convictions and remand this case to the trial court for further proceedings consistent with this decision.

CONCURRING: NOEL FIDEL, Judge, and SARAH D. GRANT, Judge.

---

**5.** Flannigan also argues that the trial court erred in permitting the state to cross-examine him concerning his prior use of both methamphetamine and a drug known as "Ecstasy." Because this issue is not likely to arise in a new trial we do not address it.