ZAGER, Justice
(dissenting).
I join Justice Waterman’s dissent. I write separately because I am not persuaded that there are sufficient reasons to justify our departure from Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). Unlike the majority, I would adopt Gant’s second prong and hold that “[pjolice may search a vehicle incident to a recent occupant’s arrest” when: (1) “the arrestee is within reaching distance of the passenger compartment at the time of the search,” or (2) “it is reasonable to believe the vehicle contains evidence of the offense of arrest.” Id. at 351, 129 S.Ct. at 1723, 173 L.Ed.2d at 501. This standard places reasonable limits on police authority to search a vehicle incident to an arrest *57 and strikes a proper balance between the individual privacy interests at stake and the State’s interest in officer safety and evidentiary objectives.
In Chimel v. California, 395 U.S. 752, 753-54, 89 S.Ct. 2034, 2035, 23 L.Ed.2d 685, 688 (1969), police arrested the defendant in his home and “then looked through the entire three-bedroom house, including the attic, the garage, and a small workshop.” The Supreme Court of the United States concluded this broad-sweeping search violated the Fourth Amendment. Id. at 768, 89 S.Ct. at 2043, 23 L.Ed.2d at 697. In so concluding, however, the Court recognized that it is reasonable for an arresting officer to search an arrestee’s person both for weapons the arrestee could use to escape or resist arrest and to prevent the concealment or destruction of evidence. Id. at 762-63, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. By logical extension, the Court also concluded an arresting officer may search “the area into which an arrestee might reach in order to grab a weapon or evidentiary items.” Id. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. Accordingly, the Court held that, incident to an arrest, an officer may search “the ar-restee’s person and the area ‘within his immediate control.’ ” Id.
In New York v. Belton, 453 U.S. 454, 457-59, 101 S.Ct. 2860, 2862-63, 69 L.Ed.2d 768, 773-74 (1981), the Court applied Chimel in the automobile context. There, an officer stopped a car for speeding. Id. at 455, 101 S.Ct. at 2861, 69 L.Ed.2d at 772. Four men were in the car. Id. During the officer’s initial encounter with the men, he “smelled burnt marihuana and [saw] on the floor of the car an envelope marked ‘Supergold’ that he associated with marihuana.” Id. at 455-56, 101 S.Ct. at 2861-62, 69 L.Ed.2d at 772. He ordered the men out of the car, placed them under arrest, and separated them on the street so “they would not be in physical touching area of each other.” Id. at 456, 101 S.Ct. at 2862, 69 L.Ed.2d at 772 (internal quotation marks omitted). “He then searched the passenger compartment of the car.” Id. “On the back seat he found a black leather jacket belonging to [the defendant].” Id. He unzipped one of the jacket’s pockets and found cocaine. Id. The defendant moved to suppress the cocaine, asserting the officer’s warrantless search of the car violated his Fourth Amendment rights. Id.
The Court broadly held that “when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.” Id. at 460, 101 S.Ct. at 2864, 69 L.Ed.2d at 775 (footnote omitted). While acknowledging the specific search incident to arrest justifications identified in Chimel, the Court opted for a workable, bright-line rule based on the generalization that the entire passenger compartment of an automobile is “generally, even if not inevitably, within ‘the area into which an arrestee might reach.’ ” Id. at 457-58, 460, 101 S.Ct. at 2862-63, 2864, 69 L.Ed.2d at 773-75 (quoting Chimel, 395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694). Following from this generalization, the Court also concluded that, incident to a lawful arrest, “police may ... examine the contents of any containers found within the passenger compartment.” Id. at 460, 101 S.Ct. at 2864, 69 L.Ed.2d at 775. The Court recognized this rule would result in searches where the likelihood police would discover a weapon or evidence of the crime of arrest was relatively low. See id. at 461, 101 S.Ct. at 2864, 69 L.Ed.2d at 775. However, the Court explained:
“The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to *58 discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.”
Id. at 461, 101 S.Ct. at 2864, 69 L.Ed.2d at 775-76 (quoting United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 440-41 (1973)).
As recognized by the majority, after Bel-ton was decided it became the subject of significant criticism by legal scholars, lower courts, and eventually members of the Supreme Court. See Thornton v. United States, 541 U.S. 615, 624, 124 S.Ct. 2127, 2133, 158 L.Ed.2d 905, 915 (2004) (O’Connor, J., concurring in part) (noting that, after Belton, “lower court decisions seem[ed] ... to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception” to the warrant requirement); id. at 627, 124 S.Ct. at 2134, 158 L.Ed.2d at 917 (Scalia, J., concurring in the judgment) (“[CJonducting a Chimel search is not the Government’s right; it is an exception — justified by necessity — to a rule that would otherwise render the search unlawful.”); State v. Vance, 790 N.W.2d 775, 787-88 (Iowa 2010) (collecting commentary criticizing and caselaw rejecting Belton). In 2009, this criticism came to a head in Gant. See 556 U.S. at 337-38, 129 S.Ct. at 1715-16, 173 L.Ed.2d at 492-93.
In Gant, the defendant pulled into the driveway of a house where police were already present. Id. at 336, 129 S.Ct. at 1715, 173 L.Ed.2d at 492. After the defendant exited the vehicle, police placed him under arrest for driving with a suspended license. See id. at 336, 129 S.Ct. at 1715, 173 L.Ed.2d at 491-92. They then secured him in the back of a police vehicle and proceeded to search his car. Id. at 336, 129 S.Ct. at 1715, 173 L.Ed.2d at 492. During the search, police discovered “a gun ... [and] a bag of cocaine in the pocket of a jacket on the backseat.” Id.
The Court began its analysis by recognizing that many lower courts understood Belton as authorizing “a vehicle search ... incident to every arrest.” Id. at 342-43, 129 S.Ct. at 1718-19, 173 L.Ed.2d at 495-96 (emphasis added). Put another way, lower courts had read Belton as giving police carte blanche to search a vehicle incident to an arrest. See id. Concerned with the potential for police abuse, the Court narrowly construed Belton, declined to grant police the right to go on baseless fishing expeditions in the automobile context, and placed reasonable limits on when police may search a vehicle incident to a lawful arrest. See id. at 347, 129 S.Ct. at 1721, 173 L.Ed.2d at 498-99 (“Construing Belton broadly to allow vehicle searches incident to any arrest would serve no purpose except to provide a police entitlement, and it is anathema to the Fourth Amendment to permit a warrantless search on that basis.”). Specifically, the Court held that “[p]olice may search a vehicle incident to a recent occupant’s arrest” when: (1) “the arrestee is within reaching distance of the passenger compartment at the time of the search,” or (2) “it is reasonable to believe the vehicle contains evidence of the offense of arrest.” Id. at 351, 129 S.Ct. at 1723, 173 L.Ed.2d at 501.
The majority criticizes Gant’s second prong as being divorced from Chimel’s underlying rationales. I do not necessarily disagree with this assertion. But Chi-mel applied to a residence and not an automobile. Thus, Chimel’s rationales *59 aside, there are sound reasons for this court to adopt Gant’s second prong.
First, as recognized by the majority, Gant did not overrule Belton, which applies in the automobile context. Instead, it identified a very specific problem with lower courts’ interpretations of Belton that permitted police searches of automobiles upon an arrest without limitation. Other decisions of the Court authorized police to arrest individuals for minor infractions, see Atwater v. City of Lago Vista, 532 U.S. 318, 354, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549, 577 (2001), and to seize individuals for traffic violations irrespective of the “actual motivations of the individual officers involved,” Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 98 (1996). This created a so-called “ ‘Iron Triangle’ by virtue of which police could make a full search of any vehicle on a mere whim by simply being patient enough to await the driver’s minor traffic violation.” 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 7.1(c), at 698-99 (5th ed.2012) (quoting Donald A. Dripps, The Fourth Amendment and the Fallacy of Composition: Determinacy Versus Legitimacy in a Regime of Bright-Line Rules, 74 Miss. L.J. 341, 392 (2004)); see also Gant, 556 U.S. at 345, 129 S.Ct. at 1720, 173 L.Ed.2d at 497 (“A rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing evidence of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless individuals.”). Gant rightly curbs discretionless automobile searches, otherwise permitted by Belton, Atwater, and Whren, by requiring that police have some basis for the search: for their own safety or to prevent the destruction of evidence; or that the nature of the underlying offense of arrest renders it likely evidence of the crime will be found in the place to be searched, the passenger compartment. That was the narrow issue addressed by the Court in Gant; the Court wisely made a conservative change in the law to remedy that specific problem and quell criticism. Presented with the same problem, the majority uses a sledgehammer when a tack hammer will do.
Second, under the Fourth Amendment, automobiles are “a category of ‘effects’ which give rise to a reduced expectation of privacy,” and which possess an inherent exigency-mobility. Thornton, 541 U.S. at 631, 124 S.Ct. at 2137, 158 L.Ed.2d at 920 (Scalia, J., concurring in the result); see also Wyoming v. Houghton, 526 U.S. 295, 304, 119 S.Ct. 1297, 1302, 143 L.Ed.2d 408, 417 (1999) (identifying an automobile’s mobile nature as justifying a lesser degree of protection under the Fourth Amendment). This is the doctrinal basis for Gant’s second prong. See Gant, 556 U.S. at 343, 129 S.Ct. at 1719, 173 L.Ed.2d at 496 (identifying “circumstances unique to the vehicle context” as justifying departure from Chi-mel’s underlying rationales and citing Justice Scalia’s Thornton concurrence). We have recognized similar principles under the Iowa Constitution. See State v. Olsen, 293 N.W.2d 216, 218, 220 (Iowa 1980) (outlining reasons for treating automobiles differently than other private property under the Federal Constitution — reduced expectation of privacy and inherent mobility— and adopting federal standards for the automobile exception under the Iowa Constitution). Given the constitutionally relevant considerations unique to automobiles, and considering the harm to be remedied — unbridled police discretion — the test articulated by the Supreme Court in Gant strikes the proper balance between the individual privacy interests at stake and the State’s interest in officer safety and evidentiary objectives. The Gant test en *60 sures that police do not stop individuals for minor traffic violations and arrest them for the sole purpose of searching their vehicles. In my opinion, when police arrest the recent occupant of a vehicle based on probable cause, and it is reasonable to believe the vehicle contains evidence related to the offense of arrest, it is not unreasonable for police to search the vehicle for that evidence. Interestingly, this case demonstrates Gant’s second prong works. Based on the nature of the underlying offense of arrest, police discovered additional drugs and a weapon.
Third, the rule adopted by the majority unwisely forces an officer to choose between securing an individual early on during a roadside encounter and leaving the individual unsecured so the officer can search the vehicle’s passenger compartment. This compromises officer safety and creates an additional opportunity for the destruction or concealment of evidence. See Thornton, 541 U.S. at 621-22, 124 S.Ct. at 2131, 158 L.Ed.2d at 913 (majority opinion) (considering how proposed rule would affect officer behavior and rejecting rule, in part, because it incentivized officers to take unnecessary risks in order to conduct automobile searches). The better rule is one that creates adequate disincentives for an officer to search an automobile when he or she truly has no basis for doing so, without compromising safety and evi-dentiary objectives. Gant’s second prong achieves this objective.
Fourth, as noted by the majority, we had previously adopted the Belton rule under the Iowa Constitution. State v. Sanders, 312 N.W.2d 534, 539 (Iowa 1981); see also Vance, 790 N.W.2d at 786 (“[I]n 1981 the Iowa Supreme Court adopted the Belton rule as the proper analysis under the Iowa Constitution.”). As discussed above, the Gant Court carefully narrowed Belton and in so doing preserved police authority to conduct automobile searches incident to an arrest, except in cases where police abuse is most likely. By rejecting Gant’s second prong, overruling our prior precedent, and taking a more drastic step than the United States Supreme Court, the majority raises serious stare decisis concerns. See Gant, 556 U.S. at 358, 129 S.Ct. at 1727-28, 173 L.Ed.2d at 505-06 (Alito, J., dissenting) (arguing the Court’s de facto overruling of Belton violates stare decisis). These concerns go largely unaddressed by the majority.
Finally, the authority cited by the majority in support of rejecting Gant’s second prong under the Iowa Constitution is unpersuasive. For example, the majority asserts the Chimel Court specifically rejected the historical precedent the Gant Court relied on in support of its second prong. Was the Gant Court not aware the Chimel Court rejected this precedent? In fact, as evidenced by the opinion, the Gant Court was aware the Chimel Court rejected this precedent. It distinguished Chimel by implicitly recognizing that Chimel involved a search incident to an arrest in a home as opposed to an automobile. See Gant, 556 U.S. at 343, 129 S.Ct. at 1719, 173 L.Ed.2d at 496 (majority opinion); Geoffrey S. Com, Arizona v. Gant: The Good, the Bad, and the Meaning of “Reasonable Belief,” 45 Conn. L. Rev. 177, 208-09 (2012) (“[I]t seems significant that the Court limited the scope of a ‘reasonable belief search to the automobile, and did not extend it to any area within the arrestee’s possession.... While the Court is obviously willing to tolerate an expanded search authority in relation to a recent arrestee’s automobile, the opinion does not (at least explicitly) indicate an analogous tolerance for other areas within an arrestee’s possession, such as her home.” (Footnote omitted.)). This distinction is constitutionally significant for the reasons noted above. If the majority believes the Supreme Court *61 incorrectly concluded circumstances unique to the automobile context justify a rule different from Chimel’s, the more cogent approach would be to say so and explain why.
Further, many of the out-of-state cases cited by the majority in support of its position that we should diverge from the Supreme Court’s interpretation of the Fourth Amendment are unpersuasive. In most cases, they are unpersuasive because of the timing of the decisions or differences in the state constitutional provisions at play. First, most of the out-of-state cases cited by the majority were decided before the Gant decision in 2009. See State v. Hernandez, 410 So.2d 1381 (La.1982); State v. Sterndale, 139 N.H. 445, 656 A.2d 409 (1995); State v. Eckel, 185 N.J. 523, 888 A.2d 1266 (2006); State v. Rowell, 144 N.M. 371, 188 P.3d 95 (2008); Commonwealth v. White, 543 Pa. 45, 669 A.2d 896 (1995); State v. Bauder, 181 Vt. 392, 924 A.2d 38 (2007). None of these decisions considered the propriety of Gant’s second prong. This is significant because “[t]he decisions of [the Supreme] Court are rendered by nine legal scholars of exceptional distinction. They come only after each case has been the subject of extensive adversarial briefing, argument, and attention.” State v. Baldon, 829 N.W.2d 785, 837 (Iowa 2013) (Mansfield, J., dissenting). Moreover, the Court is typically aware of diverging state law precedent when it makes' its decisions. See, e.g., Gant, 556 U.S. at 337-38, 129 S.Ct. at 1715-16, 173 L.Ed.2d at 492-93 (discussing underlying Supreme Court of Arizona decision in Gant, which adopted Gant’s first but not second prong). Thus, when the Court articulated the test in Gant, it was aware of state law decisions declining to follow Belton, but not conceiving of or adopting a “reasonable to believe” prong. Aware of the available options, five of the Justices concluded the two-prong test best resolved the conflicting principles at play. Id. at 354, 129 S.Ct. at 1725, 173 L.Ed.2d at 503 (Scalia, J., concurring). Four of the Justices would not have gone that far and would have affirmed Belton in its entirety. Id. at 334, 356, 129 S.Ct. at 1713-14, 1727, 173 L.Ed.2d at 491, 504 (Alito, J., dissenting). In my opinion, those pre-Gant decisions have little persuasive value and are substantially undermined by the Court’s subsequent resolution of the issue.
Several of the cases cited by the majority are distinguishable on other grounds. For example, the majority cites a Louisiana case. See Hernandez, 410 So.2d at 1381. But the Louisiana Constitution’s search and seizure provision, as a textual matter, is distinguishable from the search and seizure provisions of both the United States Constitution and the Iowa Constitution. Compare U.S. Const, amend. IV (“The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.”), and Iowa Const, art. I, § 8 (“The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.”), with La. Const. art. I, § 5 (West, Westlaw through Jan. 1, 2015, amendments) (“Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and par *62 ticularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court”). As the Supreme Court of Louisiana explained in Hernandez:
Our state constitution’s declaration of the right to privacy contains an affirmative establishment of a right of privacy, explicit protections against unreasonable searches, seizures or invasions of property and communications, as well as houses, papers and effects, and gives standing to any person adversely affected by a violation of these safeguards to raise the illegality in the courts. This constitutional declaration of right is not a duplicate of the Fourth Amendment or merely coextensive with it; it is one of the most conspicuous instances in which our citizens have chosen a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution.
410 So.2d at 1385 (citation omitted).
Of the two out-of-state cases cited by the majority decided after Gant, only one rejects Gant’s second prong under its state constitution. Compare Rose v. Commonwealth, 322 S.W.3d 76, 79-80 (Ky.2010) (applying Gant), with State v. Snapp, 174 Wash.2d 177, 275 P.3d 289, 298 (2012) (en banc) (rejecting Gant’s second prong under the Washington Constitution). Snapp, however, is not persuasive for two reasons. First, the Washington Constitution’s search and seizure provision, as a textual matter, differs substantially from both the Fourth Amendment and article I, section 8 of the Iowa Constitution. Compare U.S. Const. amend. IV, and Iowa Const. art. I, § 8, with Wash. Const. art. I, § 7 (West, Westlaw through amendments approved Nov. 4, 2014) (“No person shall be disturbed in his private affairs, or his home invaded, without authority of law.”). As the Washington Supreme Court has recognized, “[Ajrticle I, section 7 is not grounded in notions of reasonableness. Rather, it prohibits any disturbance of an individual’s private affairs without authority of law.” Snapp, 275 P.3d at 297. Second, as discussed above, Gant’s second prong is premised on circumstances unique to automobiles that the Fourth Amendment deems significant. However, these differences are less significant under the Washington Constitution than the Federal Constitution, which is, in part, why the Washington Supreme Court rejected Gant’s second prong. Id. at 296-97 (noting that an individual’s reduced expectation of privacy in an automobile and increased law enforcement needs due to the automobile’s inherent mobility are not as persuasive under the Washington Constitution as they are under the Federal Constitution); see also State v. Tibbles, 169 Wash.2d 364, 236 P.3d 885, 887-89 (2010) (en banc) (considering the mobile nature of a vehicle as a nondispositive factor in determining whether exigent circumstances justified a warrantless automobile search); State v. Patton, 167 Wash.2d 379, 219 P.3d 651, 654 n. 4 (2009) (en banc) (noting the automobile exception is not recognized under the Washington Constitution). Clearly, this is not true under the Iowa Constitution. See Olsen, 293 N.W.2d at 218, 220. The Washington Supreme Court’s reasons for rejecting Gant’s second prong under its constitution are neither applicable under the Iowa Constitution nor persuasive.
Finally, the majority does not consider at least one state court decision adopting Gant’s second prong under its state constitution. See State v. Dearborn, 327 Wis.2d 252, 786 N.W.2d 97, 105 (2010) (“[W]e hereby adopt the reasoning in Gant as the proper reading of Article 1, Section 11 of *63 the Wisconsin Constitution.... ”). Dearborn demonstrates how Gant applies in a real-world situation. In that case, an officer pulled the defendant over, placed him under arrest for driving with a revoked license, and secured him in the back of a squad car. Id. at 101. Officers then searched the defendant’s truck and discovered marijuana and related paraphernalia. Id. The Supreme Court of Wisconsin properly held “[the defendant’s] search cannot be upheld under Gant on the grounds that relevant evidence might be found in the truck, because the warden could not have reasonably expected to find evidence in the vehicle regarding [the defendant’s] revoked license.” Id. at 106. This is a reasonable, common-sense application of Gant.
The majority implies, and the special concurrences expressly assert, that modern technology, including our first-in-the-nation EDMS system, makes obtaining a roadside search warrant quick, easy, and efficient for law enforcement. Accordingly, no exigency justifies relaxing the warrant requirement in this context such that law enforcement should now be required to obtain a search warrant in effectively all roadside-stop cases. Not too much to ask, right? It then chides law enforcement: “[I]f a warrant cannot be expeditiously obtained, the problem is not with the warrant requirement of article I, section 8, but is likely an administrative problem that needs to be resolved by local authorities.” These assertions are neither grounded in logic or reality here in Iowa nor are they supported by any authority.
As the special concurrence notes, a federal trial court in the southern district of Iowa has noted that it may take police as little as twenty minutes to obtain a search warrant by telephone. United States v. Baker, 520 F.Supp. 1080, 1084 (S.D.Iowa 1981). Of course, the Federal Rules of Criminal Procedure contain detailed procedures governing warrant requests by telephone or other electronic means. Fed. R.Crim.P. 41(d)(3) (authorizing federal magistrates to issue warrants “based on information communicated by telephone or other reliable electronic means”); id. r. 4.1(b) (outlining procedures a federal magistrate must follow when determining whether to issue a warrant based on information communicated by telephone or other electronic means). Similarly, as early as 1972, police in California obtained a warrant to search a home in twelve minutes. People v. Aguirre, 26 Cal.App.3d Supp. 7, 103 Cal.Rptr. 153, 155 (1972). Not surprisingly, California also has a statute authorizing telephonic search warrants. Cal.Penal Code § 1526(b) (West, Westlaw current with urgency legislation through ch. 9 of 2015 Reg. Sess.); accord Aguirre, 103 Cal.Rptr. at 155 (“Nowhere in the language of the section does it appear that the Legislature intended to provide only for oral statements taken in the physical presence of the magistrate. Oral communications may be had by means of telephones, two-way radios or face-to-face communication.”). In 1998, an Arizona state court noted that a police department “might” be able to (not that it was actually able to like the special concurrence maintains) obtain a warrant in as little as fifteen minutes. State v. Flannigan, 194 Ariz. 150, 978 P.2d 127, 131 (Ct.App.1998). But, in Flannigan, police never actually applied for a search warrant, despite the fact that they were required to do so prior to obtaining a blood sample without an individual’s consent, and the court indicated that it may have allowed the warrant-less search (for a blood sample) had law enforcement had sufficient problems or delay in obtaining the warrant. Id. More importantly, the court’s statement regarding law enforcement’s ability to obtain a warrant was nothing more than a sum- *64 raary of the record before it, not a global generalization of the speed of the warrant process in Arizona. Id.
No one disputes that the prohibition against unreasonable searches safeguards people at all times and in all Iowa counties. But, based on nothing more than the three cases noted above and aspirations surrounding EDMS, the majority seems to believe an officer can simply type up a search warrant application, contact a judicial officer, and get permission to search a vehicle irrespective of the time of day or whether the stop occurs in a rural or urban setting. This factual assumption is simply not true. EDMS is not, and in all likelihood will not be, a 24/7 virtual magistrate. And, unlike under the Federal Rules of Criminal Procedure and the California Penal Code, there is no provision under Iowa’s search warrant statute authorizing telephonic or electronic warrants. See generally Iowa Code §§ 808.1-.15. In fact, the Iowa Code specifically requires that all applications for search warrant be in writing. See Iowa Code § 808.3.[31] Further, no party in this case developed a factual record on the speed of the warrant process in Iowa.
How many roadside stops occur after five o’clock? How many on the weekends? What about state holidays such as Memorial Day, the Fourth of July, and Labor Day? The point is, judges are often not available, and finding one may take significant time. Does the majority’s get-a-warrant-because-it’s-quick-and-easy rule apply at all times? In all places? Is the majority prepared to accept and support telephone applications for search warrants or search warrants by other electronic means? If it is, it has cited to no Iowa case supporting a telephonic or electronic search warrant, and I am likewise unable to find any such authority. Are we really prepared to change our present-day search and seizure jurisprudence based on future technology? Getting a warrant in this context is not simply a matter of inconvenience for law enforcement. In many cases, given the lack of current infrastructure, obtaining a warrant is both impractical and unrealistic.
If, as the majority maintains, it is really so important that police obtain a search warrant in this context, then it should truly be quick and easy for them to do so. But, even if it were truly that quick and easy, is it really necessary to require a search warrant under most circumstances in this context? Gant’s well-reasoned, bright-line analysis provides the answer: No. The majority’s holding — “a warrant is generally required before such a search”— is overgeneralized, divorced from reality, and adds little guidance to our search and seizure law.
The majority effectively eliminates searches incident to arrest in the automobile context. Under its new rule, when police make an arrest and remove the arrestee from the automobile, in most cases, they can no longer search the automobile’s passenger compartment absent a search warrant. This is not only unreasonable, but leads to absurd results. In my opinion, Gant establishes reasonable parameters for when police may search a motor vehicle incident to a lawful arrest. Thus, I would adopt Gant’s second prong and hold that “[pjolice may search a vehicle incident to a recent occupant’s arrest” *65 when: (1) “the arrestee is within reaching distance of the passenger compartment at the time of the search,” or (2) “it is reasonable to believe the vehicle contains evidence of the offense of arrest.” 556 U.S. at 351, 129 S.Ct. at 1723, 173 L.Ed.2d at 501. This standard places reasonable limits on police authority to search a vehicle incident to an arrest, and strikes the proper balance between the individual privacy interests at stake and the State’s interest in officer safety and evidentiary objectives. Unfortunately, the majority has charted a different course under the Iowa Constitution. This is not the course this court should take.
WATERMAN and MANSFIELD, JJ., join this dissent.

. In very limited circumstances, the Iowa Code authorizes a judge or magistrate to issue a search warrant based on information communicated by telephone. See, e.g., Iowa Code § 321J.10(3) (authorizing a blood test pursuant to a search warrant obtained via telephone under certain, exigent circumstances); id. § 462A.14D(3) (same). None of these sections apply in this case.