APPEL, Justice
(concurring specially).
I join the court’s opinion in this very sensitive area of state constitutional law involving a traffic stop and a subsequent search.[6] I write separately to explore some of the issues raised in the dissent.
*18 First, I briefly review the merits of the court’s opinion regarding the search-inei-dent-to-arrest issue raised in this case. Second, I review the merits of the State’s “neutral criteria” approach to state constitutional law proposed by the dissent. Third, in light of the discussion of the neutral criteria, I examine the dissent’s treatment of the automobile exception under the Iowa Constitution. Along the way, I contrast the dissent’s approach to the state constitutional issue, which I assume applies its neutral criteria, with an approach based on analysis of the fidelity of the automobile exception to the constitutional underpinnings of article I, section 8 of the Iowa Constitution.
I. Arguments on the Merits of Search Incident to Arrest.
The court’s opinion addresses the search-incident-to-arrest issue under article I, section 8 of the Iowa Constitution with thoroughness and precision. It is a model of scholarship and clear writing. And, it is wholly loyal to basic principles of search and seizure law under article I, section 8 of the Iowa Constitution. I write separately on the search-incident-to-arrest issue only to make a few points.
To the extent the dissent relies on “inconvenience,” there is, of course, a degree of inconvenience in requiring a warrant in this case. That much must be conceded. In fact, the warrant requirements of arti-ele I, section 8 of the Iowa Constitution generally are inconvenient provisions. If inconvenience were enough to defeat the assertion of constitutional rights, however, the warrant requirement would be meaningless, as would all the other inconvenient provisions in article I of the Iowa Constitution, such as the right to speedy trial, the right to be informed of the accusation, the right to confront witnesses, the right to compulsory process, and the right to have the assistance of counsel. Iowa Const. art. I, § 10.
The very purpose of constitutional provisions, however, is to prevent current practical considerations from eviscerating “inalienable” constitutional rights. Id. art. I, § 1. History does, of course, have models in which current practical considerations proceed without inconvenient individual protections. “[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard” of constitutional search and seizure requirements. Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290, 301 (1978).
In any event, even on a pragmatic level, while it may be somewhat inconvenient, the notion that obtaining a warrant is burdensome is no longer sustainable. At the time Carroll v. United States was decided, it might have taken several hours or even days to obtain a warrant. 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (establishing *19 the automobile exception, creating a rule that presumes exigency based upon the mobility of an automobile suspected to contain evidence of criminal activity or contraband); see Carol A. Chase, Privacy Takes a Back Seat: Putting the Automobile Exception Back on Track After Several Wrong Turns, 41 B.C. L. Rev. 71, 87-89 (1999) [hereinafter Chase]. But, things have changed. As early as 1972, police in California obtained a warrant to search a home in twelve minutes. People v. Aguirre, 26 Cal.App.3d Supp. 7, 103 Cal.Rptr. 153, 155 (1972). In 1998, an Arizona state court noted that a police department was able to get a warrant in as little as fifteen minutes. State v. Flannigan, 194 Ariz. 150, 978 P.2d 127, 131 (Ct.App.1998). Closer to home, a federal trial court in the southern district of Iowa noted that it takes as little as twenty minutes to obtain 'a telephonic search warrant. United States v. Baker, 520 F.Supp. 1080, 1084 (S.D. Iowa 1981). I agree with Chief Justice Cady’s special concurrence that in this day and age, with all of our marvelous technology, there is no reason why police officers with probable cause cannot obtain a search warrant with expedition. If a warrant cannot be expeditiously obtained, the problem is not with the warrant requirements of article I, section 8, but is likely an administrative problem that needs to be resolved by local authorities.
The dissent stresses the need for a bright-line rule in this case. The need for “bright-lines” is a good slogan, but the question of a bright-line poses a number of difficult problems. At the outset, some problems, including those of constitutional dimension, may not be amenable to a bright-line approach. For instance, the question of probable cause must be based on the totality of the circumstances and all legitimate inferences. A set of bright-line rules would be of no help and would do some harm. Similarly, in a civil context, the Restatement (Third) of Torts rejects bright-line rules in negligence cases with respect to duty and scope of duty because of the tremendous factual variation in negligence cases that defy rational categorization. See Thompson v. Kaczinski, 774 N.W.2d 829, 834-35 (Iowa 2009) (citing Restatement (Third) of Torts: Liab. for Physical Harm §§ 6, 7 (Proposed Final Draft No. 1, 2005)). A bright-line rule favoring bright-lines is a bad rule.
In addition, even if the subject matter appears amenable to a bright-line rule, the rule must be properly constructed and placed. A bright-line rule that tramples on constitutional rights may be crystal clear and plainly unlawful. In constitutional law, crafting an appropriate bright-line rule and putting it in the right place is a delicate matter. While a bright-line rule may be promoted on grounds of clarity, one must be alert to the possibility that the placement of the bright-line — where you draw the line, to use a colloquial phrase — may effectuate a significant and even dramatic shift in substantive law.
The Supreme Court’s effort to establish bright-line rules in the area of search-incident-torarrest cases illustrates the difficulty. The Supreme Court attempted to draw and place a bright-line in Marron v. United States, 275 U.S. 192, 199, 48 S.Ct. 74, 77, 72 L.Ed. 231, 238 (1927), then moved it four years later in Go-Bart Importing Co. v. United States, 282 U.S. 344, 358, 51 S.Ct. 153, 158, 75 L.Ed. 374, 383 (1931), then modified it again in Harris v. United States, 331 U.S. 145, 169, 67 S.Ct. 1098, 1110, 91 L.Ed. 1399, 1415-16 (1947), and revised it again in United States v. Rabinowitz, 339 U.S. 56, 62-63, 70 S.Ct. 430, 434, 94 L.Ed. 653, 658-59 (1950), which was then overruled in part by Chimel v. California, 395 U.S. 752, 768, 89 S.Ct. 2034, 2042-43, 23 L.Ed.2d 685, 696-97 (1969), which was itself modified in New *20 York v. Belton, 453 U.S. 454, 459-60, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 774-75 (1981), which was undercut in Thornton v. United States, 541 U.S. 615, 621-22, 124 S.Ct. 2127, 2131-32, 158 L.Ed.2d 905, 913-14 (2004), and finally revised again in Arizona v. Gant, 556 U.S. 332, 343-44, 129 S.Ct. 1710, 1719, 173 L.Ed.2d 485, 496-97 (2009). As one of the leading constitutional scholars has observed, “What renders substantive fourth amendment law incomprehensible, however, is not the lack of categorical rules but too many of them.” Albert W. Alsehuler, Bright Line Fever and the Fourth Amendment, 45 U. Pitt. L. Rev. 227, 287 (1984).
In any event, this case has a rule that strikes me as pretty bright: namely, that when a locked container in an automobile is plainly out of the reach of an arrested person, who is handcuffed and sitting in the back of a police car, and the person’s confederates are similarly removed from the proximity of the locked container, the police may not conduct a search incident to arrest without a warrant.
Importantly, the rule in this case is drawn in the right place. The placement of the line in the court’s opinion is required by the principle of the proportionality rule, which is a central component of search and seizure law under article I, section 8. The theory of the search-incident-to-arrest exception to the warrant requirement, which is not challenged in this case, generally allows police to search an arrested person and areas within the arrested person’s reach in order to prevent the arrestee from seizing a weapon or destroying evidence. See State v. McGrane, 733 N.W.2d 671, 677 (Iowa 2007). The scope of the exception to the warrant requirement, therefore, must be limited to those situations in which an arrestee might seize a weapon or destroy evidence. See id. However, when the suspect is handcuffed in the police car and his confederates are also removed from the area or thing to be searched, the search-incident-to-arrest exception simply does not apply. To allow such a search would violate the proportionality requirement of search and seizure law. On the merits, the court’s opinion is spot on.
While the dissent claims to advocate bright-line rules, such advocacy is, to some extent, inconsistent with its strong preference for federal authority, which seems to be implicit in the neutral criteria argument it advances. For instance, in Schneekloth v. Bustamonte, the United States Supreme Court rejected a bright-line requirement of knowing consent in favor of a “blender” method of constitutional adjudication in which all the circumstances present are thrown into a blender like fruits and vegetables, the blender is turned on high, and judges rule based upon a judicial taste test. 412 U.S. 218, 225-26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 861-62 (1973). Some like it sweet, some like it sour, some like it bitter. With the application of Schneekloth, you are likely to learn more about the world view of the judge — specifically, the judge’s philosophy of language and knowledge, and acceptance (or rejection) of principles of social psychology— than the true nature of the consent. Under the theory of the dissent, the neutral criteria would be employed as a barrier to prevent the court from adopting a different, more predictable, and at least arguably better, approach to the problem. As will be seen below, however, the central criteria to determine the proper approach under the Iowa Constitution should not be compliance with some kind of artificial checklist or neutral criteria designed to inhibit this court’s range of constitutional options under the Iowa Constitution. Instead, the court should use ordinary tools of constitutional interpretation, well known to lawyers and taught at every law school, to determine which approach to a particular constitutional issue is more persuasive *21 and demonstrates overall fidelity to the underlying constitutional values.
Another issue in the case is officer safety. The United States Supreme Court has traditionally been extremely attentive to issues of officer safety. The high court has recognized the lack-of-safety concern in cases like this one. See, e.g., Chimel, 395 U.S. at 753-54, 763, 89 S.Ct. at 2035, 2040, 23 L.Ed.2d at 688, 694 (finding risk that handcuffed suspect in his residence might escape and seize a weapon in next room was insufficient to justify search). In Thornton, Justice Scalia declared that for an arrested person in a squad car to be a threat, he or she must have “ ‘the skill of Houdini and the strength of Hercules.’ ” 541 U.S. at 626, 124 S.Ct. at 2134, 158 L.Ed.2d at 916 (Scalia, J., concurring .in the judgment) (quoting United States v. Frick, 490 F.2d 666, 673 (5th Cir.1973) (Goldberg, J., concurring in part and dissenting in part)). Further, Justice Scalia noted the government was unable to produce even a single example between 1990 and 2003 of a handcuffed arrestee retrieving weapons or evidence from his nearby vehicle. Id. In Gant, Justice Scalia referred to Belton’s reasoning as “fanciful reliance upon officer safety.” 556 U.S. at 353, 129 S.Ct. at 1725, 173 L.Ed.2d at 502 (Scalia, J., concurring). I think these observations are equally applicable in this case.
II. Analysis of Neutral Criteria in State Constitutional Adjudication.
A. Current Status of Iowa Law. In State v. Ochoa, we stated that in considering search and seizure issues under article I, section 8 of the Iowa Constitution, “The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.” 792 N.W.2d 260, 267 (Iowa 2010). The principle that United States Supreme Court opinions provide guidance only based upon their persuasive power was endorsed in State v. Baldon, 829 N.W.2d 785, 790 (Iowa 2013). In that case, we cited Ochoa with approval in addition to citing an early search and seizure case rejecting the exclusionary rule adopted by the United States Supreme Court. Id. (citing Ochoa, 792 N.W.2d at 281-86, 287 n. 91; State v. Tonn, 195 Iowa 94, 104-05, 191 N.W. 530, 535-36 (1923) abrogated on other grounds by Mapp v. Ohio, 367 U.S. 643, 654-55, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1089-90 (1961)).[7]
In State v. Short, we again discussed at length the rationale for independent state constitutional adjudication under article I, section 8. 851 N.W.2d 474, 481-92 (Iowa 2014). We reaffirmed the approach of Ochoa and Baldón, and rejected the notion that a departure from federal precedent could occur only if certain criteria were met. Id. at 490-92.
In Short, we recognized that historically the development of independent state constitutional law has not been universally celebrated and has occasionally drawn “bitter, accusatorial dissent[s].” Id. at 486 (internal quotation marks omitted). Citing *22 a New Hampshire case, we. noted that “ ‘heightened rhetoric adds nothing to the jurisprudence of our State.’ ” Id. (quoting State v. Canelo, 139 N.H. 876, 653 A.2d 1097, 1106 (1995) (Johnson, J., concurring specially)). We further cited a former president of the American Bar Association, who noted that “ ‘[i]ntemperate, inaccurate, and emotional criticism ... undermines public confidence in the impartiality of the judiciary and hence its independence.’ ” Id. at 506 (alteration in original) (quoting Alfred P. Carlton Jr., Preserving Judicial Independence-An Exegesis, 29 Fordham Urb. L.J. 835, 841 (2002)). Notwithstanding the dissents, we cited G. Alan Tarr, a leading scholar in the field, who, after a comprehensive review of the authorities, declared, “the concern about the legitimacy of relying on state constitutional guarantees ‘has largely been put to rest.’ ” Id. at 486 (quoting G. Alan Tarr, Understanding State Constitutions 169 (1998) [hereinafter Tarr] ).[8]
Our approach to independent state constitutional law is similar to that adopted in a. number of jurisdictions. See, e.g., Gerawan Farming, Inc. v. Lyons, 24 Cal.4th 468, 101 Cal.Rptr.2d 470, 12 P.3d 720, 751-52 (2000) (noting Supreme Court decisions are given voluntary respectful consideration); State v. Campbell, 306 Or. 157, 759 P.2d 1040, 1044 n. 7 (1988) (noting there is no presumption that interpretations of the United States Supreme Court are correct under the state constitution); State v. Tiedemann, 162 P.3d 1106, 1114 (Utah 2007) (“There is no presumption that federal construction of similar language is correct.”). As noted by Tarr, rulings by the Supreme Court “do not constitute authoritative pronouncements but are merely accounts of constitutional provisions entitled to respectful consideration by state judges independently seeking the meaning of their state constitutions.” Tarr at 207.
As noted by Robert Williams, calls for neutral criteria rest on a faulty premise. Robert F. Williams, The Law of American State Constitutions 148 (2009) [hereinafter Williams]. The premise is that the constitutional decisions of the United States Supreme Court are somehow presumptively correct and should generally be adopted by state supreme courts. See id. This premise is nowhere supported in the history or text of the Iowa or Federal Constitutions or in the structure of the federal system. As noted by Justice Stevens, the presumption of correctness of United States Supreme Court decisions with respect to state constitutional issues arises from a “misplaced sense of duty.” Delaware v. Van Arsdall, 475 U.S. 673, 699, 106 S.Ct. 1431, 1445, 89 L.Ed.2d 674, 696 (1986) (Stevens, J., dissenting). In Short, we cited Williams in supporting the Ochoa holding that in the development of independent state constitutional law, the value of federal precedent depended solely upon its persuasive force. 851 N.W.2d at 481, 490; see State v. Briggs, 199 P.3d 935, 942 (Utah 2008) (noting a state court does not presume a federal interpretation is correct); see also Campbell, 759 P.2d at 1044 n. 7 (same); Tiedemann, 162 P.3d at 1114 (same).
The dissent does not believe the approach in Ochoa, Baldón, and Short is entitled to stare decisis, nor does it think the approach in this ease is entitled to stare decisis.[9] The operative rule, appar *23 ently, is that cases the dissent agrees with are entitled to stare decisis, but cases that it disagrees with are not. Although the dissent seeks to appropriate the term stare decisis for its own use, the dissent in this case does not honor its principles. Even though the court has, once again in this case, rejected the neutral-criteria doctrine the State seeks to advance, the dissent does not take note of that. It chooses to give legal advice to the State, encouraging it to relitigate the losing issue again and again. A reading of the four dissents in Pals, Baldón, Short, and this case demonstrates the doctrine of stare decisis is not at work.[10] Instead, we see its antithesis, the doctrine of perpetual dissent.
B. Criteria in State Constitutional Interpretations. A number of state supreme courts have announced they may use certain criteria in evaluating claims under state constitutional law. The three leading cases describing criteria are State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982), Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887 (1991), and State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986) (en banc). A number of other states, often citing these eases, have indicated the usefulness of criteria in state constitutional adjudication. A number of these cases are collected in the dissent.
The criteria in these states vary somewhat but have some things in common. In particular, the criteria usually include constitutional text, constitutional history, and precedents in other state courts, as among the factors that may be considered in inde *24 pendent state constitutional analysis. See, e.g., Hunt, 450 A.2d at 955; id. at 965-67 (Handler, J., concurring); Edmunds, 586 A.2d at 895; Gunwall, 720 P.2d at 811.
State supreme courts that have ventured into announcing criteria have often subsequently faced battles over what the criteria mean. See Williams at 150-62 (citing examples of state experiences with criteria approaches). A critical question is whether the criteria are hard substantive criteria or soft advocacy criteria. Hard substantive criteria are criteria designed to erect a barrier to independent state constitutional adjudication and give rise to a presumption that the federal approach should be adopted absent a demonstration by the proponent of a divergent state constitutional rule that most or all of the criteria have been met. In other words, state constitutional law independent of federal precedent is governed by an “ironclad checklist,” and when the United States Supreme Court changes course, the state court must follow unless the requirements of a thread-the-needle checklist have been met. See People v. Scott, 79 N.Y.2d 474, 588 N.Y.S.2d 920, 593 N.E.2d 1328, 1347 (1992) (Kaye, J., concurring).
Soft advocacy criteria, however, are merely designed to improve the quality of advocacy by encouraging the parties to consider constitutional questions from a number of different points of view. Many state courts and state supreme court justices have bemoaned the lack of thorough briefing of state constitutional issues and have sought to use criteria to enhance the quality of advocacy. See, e.g., State v. Morales, 232 Conn. 707, 657 A.2d 585, 589 & n. 10 (1995) (requiring counsel to use stated nonexclusive criteria when raising state constitutional claims).
The battle over whether criteria should be considered hard substantive criteria or soft advocacy criteria may be seen in two of the leading criteria states, New Jersey and Washington. In New Jersey, for instance, the meaning of the Hunt factors was a matter of contest from the very beginning. Justice Handler and Justice Pashman battled from the get-go over whether the criteria created a presumption of the correctness of federal law. Hunt, 450 A.2d at 960 & n. 1 (Pashman, J., concurring). In Washington, the battle over the meaning of the Gunwall criteria extended over a period of many years. See Hugh D. Spitzer, New Life for the “Criteria Tests” in State Constitutional Jurisprudence: “Gunwall is Dead-Long Live Gunwall,” 37 Rutgers L.J. 1169, 1199 (2006) [hereinafter Spitzer] (suggesting the Gunwall criteria as a barrier are “dead” and the Gunwall criteria as nonexclusive suggestions for advocacy “live”). If we were to adopt criteria for state constitutional interpretation, does anyone doubt there would be a battle royale over their meaning and application?
In the end, however, many of the states have clearly embraced a soft advocacy approach to their criteria. An indication of the dominance towards this approach is the increasing reference to the criteria as “nonexclusive.” See, e.g., Gunwall, 720 P.2d at 811 (noting the factors are “nonexclusive”). Listing criteria as nonexclusive does seem to indicate they are suggestions rather than mandatory requirements.
Further, the Pennsylvania Supreme Court has declared the Edmunds factors are not a mandate that a decision recognizing heightened protections utilize the criteria but instead are intended as a guide for litigants. Commonwealth v. Shaw, 564 Pa. 617, 770 A.2d 295, 298 n. 2 (2001). In the state of Washington, after several decades of litigation, a commentator has concluded that the Gunwall factors have been made so flexible and so encompassing that they have simply merged with the ordinary *25 principles of constitutional litigation. See Spitzer, 37 Rutgers L.J. at 1184-87.
Hard or soft, other states have used criteria so open-endedly they approach normal rules of constitutional adjudication. For example, in State v. McMurray, a case cited by the dissent, the Minnesota Supreme Court noted that under circumstances when the state and federal constitutions use substantially the same language, additional state protection may be afforded,
(1) when the United States Supreme Court has made a sharp or radical departure from its previous decisions and we discern no persuasive reason to follow such a departure; (2) when the Court has retrenched on a Bill of Rights issue; or (3) when the Court precedent does not adequately protect our citizens’ basic rights and liberties.
860 N.W.2d 686, 690 (Minn.2015) (internal quotation marks omitted). These open-ended criteria give the Minnesota Supreme Court ample room to develop independent state constitutional law according to ordinary principles of constitutional interpretation.
A number of cases under article I, section 10 of the Minnesota Constitution, which is a search and seizure provision parallel to article I, section 8 of the Iowa Constitution, demonstrate the flexibility. For example, in State v. Carter, the Minnesota Supreme Court held that a sniff by a drug detection dog outside a storage unit was a “search,” contrary to prevailing federal precedent. 697 N.W.2d 199, 208, 210-11 (Minn.2005) (en banc). In State v. Askerooth, the court declared that the approach of the United States Supreme Court in Atwater v. City of Lago Vista, 532 U.S. 318, 354, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549, 577 (2001), which allowed full arrests for minor criminal violations, would not be followed under the Minnesota Constitution. 681 N.W.2d 353, 363 (Minn.2004) (en banc). In State v. Fort, the Minnesota court held that a consent search of a passenger in a vehicle stopped for routine traffic violations exceeded the scope of the search and was invalid under the Minnesota Constitution regardless of what federal law might allow. 660 N.W.2d 415, 418-19 (Minn.2003) (en banc). In Ascher v. Commissioner of Public Safety, the court refused to follow Michigan Department of State Police v. Sitz, 496 U.S. 444, 455, 110 S.Ct. 2481, 2488, 110 L.Ed.2d 412, 423 (1990), holding that random police roadblocks for intoxicated drivers without reasonable suspicion violated article I, section 10 of the Minnesota Constitution. 519 N.W.2d 183, 187 (Minn.1994) (en banc). In In re Welfare of E.D.J., the Minnesota Supreme Court rejected California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690, 697 (1991), holding that a person facing contact with a police officer is “seized” when he reasonably concludes that he is not free to leave, noting that it was not “persuaded” by the United States Supreme Court’s departure from its earlier cases. 502 N.W.2d 779, 781-83 (Minn.1993) (en banc). Nothing in the case of Kahn v. Griffin, which suggests factors that parties may choose to brief with respect to constitutional issues based on prior caselaw, indicates these cases were wrongly decided. 701 N.W.2d 815, 829 (Minn.2005) (en banc) (suggesting, as a “general” rule, seven nonexclusive factors).
Indeed, the notion that criteria are usually only suggestions for advocacy and not designed as barriers to independent state constitutional law can be demonstrated in the context of automobile searches and seizures. The dissent declares that if we adopted a neutral-criteria approach, the result would be different in this case. However, that assumes we adopt a hard substantive approach or ironclad-checklist *26 approach. An examination of the vibrant independent state law in leading criteria jurisdictions shows the criteria have not been employed as a major barrier to the development of independent state constitutional law. For example, the Pennsylvania Supreme Court has declined to follow the Carroll doctrine. Commonwealth v. Brown, 23 A.3d 544, 553 (Pa.Super.Ct.2011). The Washington Supreme Court has also declined to follow Carroll. State v. Snapp, 174 Wash.2d 177, 275 P.3d 289, 296 (2012) (en banc). The New Jersey Supreme Court rejected Belton in the court’s opinion in State v. Eckel, 185 N.J. 523, 888 A.2d 1266, 1277 (2006). See Paul Stern, Revamping Search-and-Seizure Jurisprudence Along the Garden State Parkway, 41 Rutgers L.J. 657, 688-92 (2010). Similarly, Wyoming, another criteria state, declined to follow Belton. Vasquez v. State, 990 P.2d 476, 489 (Wyo.1999).[11]
The above experience demonstrates two things. First, in most states, criteria have not served as a barrier to independent state constitutional adjudication as advocated by the dissent. Second, a significant downside to criteria is that they generate satellite litigation over their substance and proper application. See Williams at 151— 52 (noting in criteria states, the criteria themselves become the focus of litigation *27 rather than the underlying state constitutional question). In reality, there is no mechanical checklist that can be applied to determine each and every question of state constitutional law. The court is thus correct in reaffirming the Tonnr-Ochoa approach, reiterated in Short and Baldon, and in rejecting appeals to establish artificial criteria for independent state constitutional adjudication. Short, 851 N.W.2d at 487; Baldon, 829 N.W.2d at 790-91.
C. The State’s Neutral Criteria. While we have rejected the criteria approach for state constitutional adjudication, the State’s neutral criteria suggest several potential approaches to independent state constitutional law. Subject to ethical constraints and procedural rules, we do not limit the substantive advocacy of parties who appear before us. Any party may make what it considers its most persuasive state constitutional arguments. As will be seen below, we have already explored all of the State’s neutral criteria in our cases, and the State’s effort in this case is essentially a repackaging and relabeling of concepts rejected in our caselaw. WTiile we have resisted any formula for constitutional adjudication, our caselaw amply illuminates the manner in which various authorities may contribute to the development of independent state constitutional law.
1. Development of the claim in lower courts. The first criterion proposed by the State is development of the claim in lower courts. This factor has not generally been cited by other criteria states: it is missing in Hunt, Edmunds, Gumvall, and other criteria cases. See generally, Williams at 146-62. The thrust of the State’s position here, however, can best be understood as one of issue preservation. The State in effect presses the view that if a party has not presented an argument based on its neutral criteria, any claim based upon an independent state constitutional theory is waived.
Even in criteria states, such an approach may not be followed. For example, in Pennsylvania, the court has emphasized that while briefing on its factors is certainly helpful, the failure to do so is not fatal to a state constitutional claim. See Commonwealth v. Swinehart, 541 Pa. 500, 664 A.2d 957, 961 n. 6 (1995); Phyllis W. Beck, Foreivord: Stepping Over the Procedural Threshold in the Presentation of State Constitutional Claims, 68 Temp. L. Rev. 1035, 1038-39 (1995) (emphasizing that a litigant seeking to assert rights under state constitutions should be “free from a technical procedure that may not always serve to advance the inquiry at hand”).
In any event, we have established our approach to issue preservation regarding independent state constitutional law in a number of cases. When a constitutional claim is made but neither the State nor Federal Constitution is specifically identified, we consider the claim preserved under both the State and Federal Constitutions. See, e.g., State v. Harrington, 805 N.W.2d 391, 393 n. 3 (Iowa 2011); King v. State, 797 N.W.2d 565, 571 (Iowa 2011). On the other hand, when a claim is expressly made citing the Fourth Amendment but no mention is made of the state constitution, we consider the claim waived. See, e.g., State v. Vance, 790 N.W.2d 775, 780 (Iowa 2010); State v. Allensworth, 748 N.W.2d 789, 791 n. 2 (Iowa 2008). When both the State and Federal Constitutions are cited but a party relies solely on the applicable federal constitutional standard, we apply the federal constitutional standard but reserve the right to apply it in a more stringent manner. See, e.g., State v. Breuer, 808 N.W.2d 195, 200 (Iowa 2012); State v. Pals, 805 N.W.2d 767, 771-72 (Iowa 2011); King, 797 N.W.2d at 571; State v. Bruegger, 773 N.W.2d 862, 883 *28 (Iowa 2009). We have thus already addressed the issues raised in the State’s first criteria.
2. Constitutional text. The second criterion offered by the State is constitutional text. This is a common factor cited by many criteria states. See, e.g., Hunt, 450 A.2d at 965 (Handler, J., concurring); Edmunds, 586 A.2d at 895; Gunwall, 720 P.2d at 811. As one state supreme court has stated, an independent state constitutional argument may be made on the basis of text alone. See Tiedemann, 162 P.3d at 1115. We have considered the role played by text in a number of our prior cases. See, e.g., Short, 851 N.W.2d at 500-01; Baldon, 829 N.W.2d at 823-24 (Appel, J., specially concurring); Ochoa, 792 N.W.2d at 268-69. I stand by the discussion in those cases.
The text of a constitutional provision is the starting point of analysis even in ambiguous and open-ended constitutional provisions like article I, section 8 of the Iowa Constitution. In the context of search and seizure law, however, textual analysis is often very challenging, so challenging that some preeminent authorities have concluded that the text itself offers no meaningful guidance on a number of key interpretive issues. See Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 353-54 (1974). Particularly challenging has been the relationship between the reasonableness clause and the warrant clause, an issue addressed at length in Short, 851 N.W.2d at 483-85.
To the extent the state constitution has text not included in the Federal Constitution, like the language in article I, section 1 based on the Virginia Declaration of Rights, federal authority, of course, has little value. See City of Sioux City v. Jacobsma, 862 N.W.2d 335, 348-49 (Iowa 2015); Bruce Kempkes, The Natural Rights Clause of the Iowa Constitution: When the Law Sits Too Tight, 42 Drake L. Rev. 593, 634-35 (1993). Further, to the extent there are differences in language in texts related to the same subject matter, any difference in language between the Iowa Constitution and its federal counterpart is worth a hard look. For example, the right to counsel provision in article I, section 10 of the Iowa Constitution extending the right to “all criminal prosecutions, and in all cases involving the life, or liberty of an individual” differs from its federal counterpart. Iowa Const, art I, § 10; see State v. Young, 863 N.W.2d 249, 256-57 (Iowa 2015). Such differences in text should be carefully studied and may help support a different interpretation under the state constitution than under prevailing federal authority. See, e.g., Young, 863 N.W.2d at 258, 281.
It is also true, as an abstract matter, that a case from another jurisdiction relying on a differently phrased state constitutional provision may be less authoritative than one decided under a similar state constitutional provision. This is not, however, to use the vernacular of the dissent, a bright-line rule. The underlying state court decision may not turn on distinctive language but may be based upon an analysis that applies with equal force to an Iowa constitutional provision covering the same subject matter. Different language in state constitutions may still have much in common, like the proverbial overlapping Venn diagram. Nonetheless, it is undeniable that a state court decision decided under a differently worded constitutional provision may be less persuasive or not persuasive at all, if the decision is based largely or exclusively on language absent from the counterpart in the Iowa Constitution.
One suspects, however, that in the hands of the dissenters, this factor is designed to be an ironclad, hard substantive criterion *29 such that if the text of an Iowa constitutional provision is similarly worded to the federal counterpart, the federal interpretation is presumptively (or maybe even definitely) correct. If so, this is, of course, the polar opposite of a neutral criterion. It would ironically impede the development of state constitutional law where there are parallel federal and state provisions, even though all the federal rights language was derived from previous state constitutional models. See Baldon, 829 N.W.2d at 804-05 (noting the United States Constitution “was the outgrowth of colonial experience and state constitutional precedents”); see also Willi Paul Adams, The First American Constitutions: Republican Ideology and the Making of the State Constitutions in the Revolutionary Era 55-56 (Rita & Robert Kimber trans., expanded ed.2001) (noting John Adams’s reasoning in recommending that New Hampshire form its own government); Robert F. Williams, The State Constitutions of the Founding Decade: Pennsylvania’s Radical 1776 Constitution and Its Influences on American Constitutionalism, 62 Temp. L. Rev. 541, 579-80 (1989) (citing the emerging consensus that the Federal Bill of Rights originated in state and colonial rights guarantees). An approach that strongly presumes the correctness of federal authority under similarly phrased constitutional provisions is not a neutral criterion that requires careful textual analysis, but an unbalanced criterion that seeks to prevent the development of state constitutional law. We have repeatedly and unequivocally rejected this contention, and by now it should have been put to rest. See, e.g., Short, 851 N.W.2d at 486-87; Baldon, 829 N.W.2d at 790-91 (majority opinion) (recognizing Tonn-Ochoa analysis in interpreting nearly identical search and seizure language of the Iowa Constitution differently than its federal counterpart); id. at 824 (Appel, J., specially concurring) (citing various state supreme court cases supporting independent interpretation of provisions of state constitutions with parallel federal counterparts); Ochoa, 792 N.W.2d at 267 (holding the degree to which we follow United States Supreme Court precedent, or any other precedent, “depends solely upon its ability to persuade us with the reasoning of the decision”). Indeed, the notion that state search and seizure provisions nearly identical to the federal language should be interpreted identically to their federal counterpart in connection with automobile stops has been rejected in leading criteria jurisdictions. See Vance, 790 N.W.2d at 788 (citing examples); see, e.g., Eckel, 888 A.2d at 1277; Commonwealth v. White, 543 Pa. 45, 669 A.2d 896, 901-02 (1995); Vasquez, 990 P.2d at 488-89.
To the extent the State argues that text should be considered in state constitutional adjudication, there can be no quarrel. Text is always a starting point in constitutional adjudication. It would be wrong, however, to suggest that the text of article I, section 8 provides a definitive answer to many complex search and seizure questions. Consistent with the above cited authorities, however, there is no implication that the mere fact article I, section 8 of the Iowa Constitution has language similar to the Fourth Amendment gives rise to a presumption that the federal interpretation should be adopted. The power of federal precedent turns “solely” on its persuasive power. See Ochoa, 792 N.W.2d at 267.
3. Constitutional history, including reports of state constitutional debates and state precedent. The third criterion listed by the State is constitutional history, including reports of state constitutional debates and state precedent. Similar factors are cited in a number of criteria states. See, e.g., Hunt, 450 A.2d at 965; Ed *30 munds, 586 A.2d at 895; Gunwall, 720 P.2d at 811. We have canvassed state and federal constitutional history in a number of our recent search and seizure cases. See, e.g., Short, 851 N.W.2d at 481-506; Ochoa, 792 N.W.2d at 269-75.
We reviewed the historical background of the Fourth Amendment extensively in Ochoa, 792 N.W.2d at 269-73. The meaning of its history is, of course, subject to debate, and the historical record often does not provide much guidance on highly-focused, concrete interpretive questions in the area of search and seizure. In Ochoa, however, we concluded the Fourth Amendment history generally supported the view that the search provisions were a limitation on government power, that general warrants and writs of assistance were anathema to the founders, and that requiring particular facts to support a search is a limitation consistent with that history. Id.
While we should be cautious of drawing overbroad conclusions from historical study, I agree with the State that historical study of the origins of the Fourth Amendment may be relevant to state constitutional analysis. In ShoH, for instance, we cited the work of Thomas Y. Davies, who has encouraged state supreme courts to engage in authentic search and seizure historical analysis to avoid unoriginal use of reasonableness that engages in relativistic balancing. 851 N.W.2d at 501 (citing Thomas Y. Davies, Correcting Search-And-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of “Due Process of Law,” 77 Miss. L.J. 1, 118, 223-24 (2007)). We have attempted to follow Davies’s suggestion. See Ochoa, 792 N.W.2d at 274-75. Additionally, William Cuddihy, in his magisterial volume on the history of the Fourth Amendment, concluded that the “warrant preference” approach to the text — the approach we embraced in ShoH — was the most consistent with the founders’ intentions. William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791 602, 633-37, 734-42 (2009); see also Short, 851 N.W.2d at 497, 501; Tracey Maclin, The Complexity of the Fourth Amendment: A Historical Review, 77 B.U. L. Rev. 925, 928 (1997) (“[T]he ‘warrant preference rule’ ... requires that the safeguards of the Warrant Clause define the reasonableness of a given search or seizure.”).
With respect to article I, section 8 of the Iowa Constitution, we surveyed the history in Ochoa and did not discover materials having a direct bearing on search and seizure law. 792 N.W.2d at 274-75. This is not unusual. As noted by one scholar, state historical sources are “thin at best and wholly indeterminate at worst.” Douglas S. Reed, Popular Constitutionalism: Toward a Theory of State Constitutional Meanings, 30 Rutgers L.J. 871, 873 (1999); see also Paul W. Kahn, Interpretation and Authority in State Constitutionalism, 106 Harv. L. Rev. 1147, 1153 (1993) (noting that state sources are “meager”).
While the dissent in announcing its so-called neutral criteria embraces historical exploration, it avoids engaging in any historical consideration regarding what the Iowa founders would have thought of the proposed so-called neutral criteria. There is, of course, nothing in the debates about so-called neutral criteria. We do, however, know something about the founders’ view of federal law and the United States Supreme Court’s interpretation of it.
For example, George Ells, one of the leading Iowa founders, believed the Fugitive Slave Act of 1850 was an unconstitutional violation of due process. He stated that the Due Process Clause was “violated again and again by the dominant party in the land, which rides roughshod ove[r] the necks of freemen.” 1 The Debates of the *31 Constitutional Convention of the State of Iowa 102 (W. Blair Lord rep., 1857) [hereinafter The Debates ]. Further, he declared that “[i]f the words ‘due process of law,’ shall in time be recognized by our judicial tribunals to mean what they really do mean, ... then, [t]hat infamous Fugitive Slave Law will become a nul[l]ity.” Id.[12]
William Penn Clarke, another of the leading players in the constitutional convention, was a supporter of John Brown, and actively helped Brown smuggle fugitive slaves out of Iowa to their eventual freedom in direct defiance of federal law. See Lowell J. Soike, Necessary Courage: Iowa’s Underground Railroad in the Struggle Against Slavery 153-57 (2013) [hereinafter Soike]. Ells and Clarke do not seem to be the kind of persons who would write into the Iowa Constitution some principle of deference to federal judicial authority. And, of course, they did not.
However, the Iowa Constitution of 1857 contains provisions that were contrary to the Fugitive Slave Act of 1850, including the right to jury trials in cases involving liberty. See Short, 851 N.W.2d at 521 (citing The Debates 101-02); Ben. F. Shambaugh, The Constitutions of Iowa 270-71 (1934) (noting some opposition to the jury trial provision on the ground that it would “nullify[ ] the Fugitive Slave Law”). The jury trial provision appears contrary to the United States Supreme Court decision in Prigg v. Commonwealth, where the Court held a state could not impose protective procedures on the enforcement of the Fugitive Slave Act of 1793. 41 U.S. (16 Pet.) 539, 625-26, 10 L.Ed. 1060 (1842). James F. Wilson, a delegate to the Iowa constitutional convention who later gained fame as chairman of the United States House Committee on the Judiciary, declared that “he did not care if the provision under consideration should conflict with federal law” because the Fugitive Slave Act was unconstitutional. Robert Cook, Baptism of Fire: The Republican Party in Iowa, 1888-1878 81 (1994) [hereinafter Cook].
Further, throughout the 1850s, there was a battle in Iowa over enforcement of laws related to slaves or former slaves where state courts were the forum of choice because of the inhospitable climate in federal court on these issues. In the case of In re Jim (1848), a state court judge discharged a claimed slave and fined the detective who had detained him. See Robert R. Dykstra, Bright Radical Star: Black Freedom and White Supremacy on the Hawkeye Frontier 17-18 (1993). The detective did not give up, but convinced a federal judge in Dubuque to order a precept for arrest for Jim, the claimed fugitive slave. See id. at 18. Supporters of Jim, however, countered by obtaining a writ of habeas corpus in Muscatine from the acting Chief Justice of the Iowa Supreme Court who, after a hearing, held that the arrest was improper, released the defendant, and declared to bystanders, “here is a free man.” Id. (internal quotation marks omitted).
In another case involving a claimed fugitive slave in 1855, Governor James W. Grimes declared “if not in office, I am inclined to think that I should be a lawbreaker.” Cook at 65 (internal quotation marks omitted). He sent his associates to *32 pack the trial which was before a commissioner for the federal district court in Burlington. Id.; see also Outside In African-American History in Iowa 1838-2000 68 (Bill Silog ed.2001) [hereinafter Outside In ]. Grimes sent for a state court judge to prepare a writ of habeas corpus in the event of an adverse result in the federal forum. Outside In at 68. When the alleged fugitive slave was freed for lack of evidence, Governor Grimes declared that “a slave could not be returned from Des Moines County into slavery.” Cook at 65-66 (internal quotation marks omitted). The alleged fugitive was soon on his way to Canada. Outside In at 68.
The case of In re Ralph, of course, employed an approach to African Americans that was nowhere found in the federal caselaw. 1 Morris 1 (Iowa 1839). Not surprisingly, the reaction of the founding generation to Dred Scott was one of bitter denunciation, including a joint resolution of the general assembly that “ ‘Dred Scott [ ] is not binding in law.’ ” See Short, 851 N.W.2d at 484 (quoting 1858 Iowa Acts Res. 12, at 433). At the time of the 1857 Iowa Constitution, the United States Supreme Court was in the hands of judges sympathetic with the southern cause: the opposite was true in Iowa. Indeed, one of the causes of the civil war was the refusal of states like Iowa to conform with federal law with respect to slavery. See Confederate States of America — Declaration of the Immediate Causes Which Induce and Justify the Secession of South Carolina from the Federal Union (adopted Dec. 24, 1860), available at http://avalon.law.yale.edu/19 th_century/csa_scarsec.asp [hereinafter Declaration of the Immediate Causes] (specifically citing the failure of northern states, including Iowa, to enforce federal law).[13] To my eye, these events, contemporaneous with the Iowa Constitution of 1857, provide barren soil for those that seek to impose federal lockstep directly or indirectly on Iowa courts in the name of history. See generally Mark S. Cady, The Vanguard of Equality: The Iowa Supreme Court’s Journey to Stay Ahead of the Curve on an Arc Bending Towards Justice, 76 Alb. L. Rev. 1991 (2013); Mark S. Cady, A Pioneer’s Constitution: How Iowa’s Constitutional History Uniquely Shapes Our Pioneering Tradition in Recognizing Civil Rights and Civil Liberties, 60 Drake L. Rev. 1133 (2012).
The important point, however, with respect to search and seizure law specifically, is that the lack of direct historical materials related to article I, section 8 should not be charged as a factor against an independent interpretation of state law. The lack of historical materials neither supports nor opposes a state constitutional interpretation different from prevailing federal law.[14] This is particularly true in the area of search and seizure, where current cases often involve modern developments such *33 as cell phones, GPS devices, computerized records, and even automobiles, which the Iowa founders could not possibly have anticipated. Under the circumstances, to attribute lack of a historical record as a strike against thoughtful independent state constitutional adjudication is hardly a neutral criterion but is simply an artificial barrier designed to yield desired results and prevent consideration of the underlying merits of a state constitutional claim.
4. Decisions of sister states, particularly when interpreting similar constitutional text. The fourth criterion proposed by the State is the decisions of other states, particularly when interpreting similar constitutional provisions. In general, review of authority in other states is a criteria almost universally found in criteria jurisdictions. See, e.g., Hunt, 450 A.2d at 956-57; Edmunds, 586 A.2d at 895; Gunwall, 720 P.2d at 815-16. In our independent state constitutional cases, we have often looked at authority from other states for their persuasive power. See, e.g., Short, 851 N.W.2d at 481; Baldon, 829 N.W.2d at 818; Ochoa, 792 N.W.2d at 267.
Of course, there is no requirement authority exist in other states for a particular constitutional approach. Otherwise, the law would be the proverbial “fly frozen in amber.” By definition, there always has to be a first jurisdiction that moves when the law changes. No one explicitly suggests, even the dissent, that the law should never change. Further, some questions of state constitutional law may be of first impression, even among the various state jurisdictions. Certainly, as a general matter, the caselaw of other states may be the source of persuasive authorities to aid in the interpretation of Iowa constitutional law.
In order to be persuasive authority, however, a “me too” case in a lockstep jurisdiction that simply incorporates federal law without an evaluation of its persuasive reasoning is of little value. Such precedent is not part of the body of considered reasoning of constitutional principles. Instead, we look to the persuasive power of the reasoning of other state supreme courts which, using their independent judgment, have sought to develop what they consider the best and soundest approach to state constitutional law. In looking at the competing approaches in state precedents, we do not make our determination by a majoritarian numbers game that assumes resolution of sensitive issues of state constitutional law may be determined on some kind of state constitutional abacus. What is critical with state constitutional precedents in other states, as with all cited authority, is the underlying persuasive power of the reasoning. See Ochoa, 792 N.W.2d at 267 (emphasizing we are influenced by cases from other jurisdictions solely on the basis of their persuasive power).
Thus, the independent work of other state supreme courts that present persuasive arguments may be of considerable value. There is a rich body of state constitutional authority on search and seizure law when state courts grapple with the challenging issues under their state constitutions. Such authority is readily available for Iowa practitioners in the pages of the various law reviews, easily accessible electronic databases, and in the works of Robert F. Williams, G. Alan Tarr, Jennifer Friesen, and others. See generally Baldon, 829 N.W.2d at 814-20.
Further demonstration of the potential importance of developments in state constitutional law is revealed in Vance, 790 N.W.2d at 786-88. In that case, we faced the question of whether counsel was ineffective in failing to recognize Belton was under substantial attack in state courts and might no longer be good law for pur *34 poses of state constitutional analysis. Id. at 787-88. While we were not in a position to determine the question of ineffective assistance on the record before us, Vance clearly stands for the proposition that defense counsel should have a working knowledge of the larger state constitutional trends around the country. Id. at 789-90.
5. Practical consequences, including the need for national uniformity. The last criterion proposed by the State is consideration of practical consequences, including the need for national uniformity. Interestingly, none of the cases cited by the dissent has a similar criterion with emphasis on national uniformity.[15]
In Short, we canvassed reasons why we rejected the argument that national uniformity should be an inhibiting factor in the development of independent state constitutional law. 851 N.W.2d at 487-89. The reasons need not be repeated at length here. Suffice it to say we have' generally rejected calls for uniformity on the ground that such calls were inconsistent with the federalist system, would require adoption of constitutional norms diluted by federalist considerations in a context in which federalism concerns were wholly absent,[16] would ironically convert the federal floor into a federal ceiling with respect to individual liberties, and would be inconsistent with our state’s history of independent adjudication. See id.; Baldon, 829 N.W.2d at 825-27; Ochoa, 792 N.W.2d at 266 n. 4. On this question of whether national uniformity should be an important consideration, our past cases have provided the State with the answer. See, e.g., Short, 851 N.W.2d at 487-89; Baldon, 829 N.W.2d at 825-27; Ochoa, 792 N.W.2d at 266 n. 4.
6. Missing considerations. A striking feature about the State’s neutral criteria is what is not included. Fidelity to underlying constitutional values, for instance, is not a criterion, nor is analytical soundness, nor the right sizing of any rule that might be adopted. These concepts, however, are at the heart of our independent state constitutional adjudication.
In addition, the State does not mention the potential persuasive power of minority opinions of the Supreme Court. Majority opinions of the Supreme Court may be persuasive, but so too may concurring and dissenting opinions of that Court. Indeed, in Ochoa, we relied to a significant extent on Justice Stevens’s cogent dissent in Samson v. California, 547 U.S. 843, 857, 126 S.Ct. 2193, 2202, 165 L.Ed.2d 250, 262 (2006) (Stevens, J., dissenting). Ochoa, 792 N.W.2d at 282-83. Similarly, in Callender v. Skiles, we held a father’s liberty interest was given greater protection under the Iowa Constitution than the United States Constitution, citing a dissenting position of Justice Brennan in Michael H. v. Gerald D., 491 U.S. 110, 141, 109 S.Ct. 2333, 2351, 105 L.Ed.2d 91, 117 (1989) (Brennan, J., dissenting). Callender v. Skiles, 591 N.W.2d 182, 191 (Iowa 1999). And, of course, when relying upon dissents, what must be persuasive is the reasoning, not the fact that an opinion *35 reached a particular result. See Campbell, 759 P.2d at 1044 n. 7.
7. Summary. Our caselaw has clearly addressed the significance of the neutral criteria proposed by the State in this case. While we have often considered text, history, and state and federal court precedents, we have refused to create a checklist that would erect a barrier to state constitutional development or provide a basis for unproductive satellite litigation.
Thus, the real problem for the State, and the dissent, is not lack of guidance, but disagreement with the guidance that has been provided. The dissent wants to erect artificial barriers to the development of independent state constitutional law. I reject them. The dissent believes that when the texts of state and federal constitutional provisions are similar, we should follow the federal model regardless of its lack of persuasive power. I reject that too. The dissent wants a strong presumption that federal law is correct. I say no. The dissent seeks to incorporate wholesale the substantive results of the recent trends in United States Supreme Court caselaw, results that it likes. We have rejected wholesale importation of federal law. We do, however, consider the merits of each case before us and carefully study United States Supreme Court cases, like other authorities, for persuasive power. I reiterate, the problem is not lack of guidance, but only disagreement with the guidance that has been provided.
III. Arguments on Merits of Automobile Exception.
The dissent takes a position on the merits of the application of the automobile exception under article I, section 8 of the Iowa Constitution to this case. Having urged this court to adopt the State’s neutral criteria, I assume the dissent represents the criteria in action. ■ The dissent provides a bulk cite of state authorities that follow the federal approach to the automobile exception in their interpretation of state constitutional law. It does not summarize or address the reasoning of caselaw that comes, to a different conclusion because it is not relevant. Unstated, but certainly implied in the criteria embraced by the dissent, is the notion that uniformity is important and the result is justified because the language of the Iowa constitutional provision related to search and seizure is similar to the Fourth Amendment. The opinion is consistent with the dissent’s approach to criteria, which is designed to prevent development of independent state constitutional law.
Our cases require a different methodology. Unlike the dissent, I would begin with the text of article I, section 8. From the text, we know the provision states people should be “secure” in their “papers and effects.” Iowa Const, art I, § 8. The search of a locked safe in an automobile at least raises my constitutional eyebrows in light of the language of the text. Certainly, the constitutional values underlying article I, section 8 are at least potentially implicated by the search of a locked safe in an automobile. We must inquire further.
Unlike the dissent, I would also identify a general framework for consideration of the issues. We have recognized we should apply article I, section 8 “in a broad and liberal spirit.” State v. Height, 117 Iowa 650, 657, 91 N.W. 935, 937 (1902). We should also recognize that under Iowa law, the warrant requirement is “ ‘subject only to a few specifically established and well-delineated exceptions.’ ” Baldon, 829 N.W.2d at 791 (majority opinion) (quoting Schneckloth, 412 U.S. at 219, 93 S.Ct. at 2043, 36 L.Ed.2d at 858).
Recognizing the potential implications of article I, section 8 on the search that occurred in this case, I next turn to the *36 underlying rationale of the automobile exception as it has been developed by the United States Supreme Court. Generally, there are two rationales supporting the automobile exception. First, the automobile exception is based upon the view that automobiles are inherently mobile and, as a result, a warrant to search the vehicle should not be required. See Carroll, 267 U.S. at 153, 45 S.Ct. at 287, 69 L.Ed. at 551. Second, the automobile exception has been justified on the ground that the owner or occupant of an automobile has a reduced expectation of privacy compared to the privacy ordinarily associated with a home or residence. United States v. Chadwick, 433 U.S. 1, 12-13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538, 549 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565, 579, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619, 633-34 (1991).
This reduced expectation of privacy is based on two theories. First, it is contended that automobiles are used for transportation purposes on the open highway and thus no reasonable expectation of privacy should arise with respect to papers and effects found in automobiles. Id. at 12, 97 S.Ct. at 2484, 53 L.Ed.2d at 549 (citing Cardwell v. Lewis, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325, 335 (1974) (plurality opinion)). Second, it is asserted that an owner has a reduced expectation of privacy based on the fact an automobile is subject to substantial regulatory control, including licensure, registration, equipment regulation, and rules of the road. Id. at 12-13, 97 S.Ct. at 2484, 53 L.Ed.2d at 549; see also California v. Carney, 471 U.S. 386, 392-93, 105 S.Ct. 2066, 2069-70, 85 L.Ed.2d 406, 413-14 (1985) (noting pervasive regulation).
Next, I explore the validity of the rationales in light of the purposes of article I, section 8. A review of the literature quickly reveals the rationales behind the automobile exception have been roundly criticized. For instance, Professor Adams has analyzed the automobile exception in detail and found it wanting. James A. Adams, Search and Seizure As Seen by Supreme Court Justices: Are They Serious or Is This Just Judicial Humor?, 12 St. Louis U. Pub. L. Rev. 413 (1993) [hereinafter Adams]. According to Professor Adams, the mobility argument in support of the automobile exception “has no basic integrity” when the automobile has been immobilized through impoundment. Id. at 424. It has also been argued that while it might have taken hours or days to obtain a warrant when Carroll was decided, and therefore a warrant was impractical in the context of an automobile stop, such a rationale no longer applies in today’s technological world when warrants may be obtained in minutes rather than hours or days. See Chase, 41 B.C. L. Rev. at 87-89.
The rationale supporting the automobile exception based upon a reduced expectation of privacy has also been questioned. For instance, as cited by Professor La-Fave, “ ‘personal effects so stored’ ” in automobiles are entitled to constitutional protections and that most Americans regard their automobiles as “ ‘more than merely a method of transportation.’ ” 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 7.2(b), at 735 (5th ed.2012) [hereinafter LaFave] (quoting Lewis R. Katz, Automobile Searches and Diminished Expectations in the Warrant Clause, 19 Am. Crim. L. Rev. 557, 571 (1982) [hereinafter Katz]). Professor Adams agrees decreased expectation of privacy embraced by the Supreme Court “has little to support it” and “merely stating that there is a diminished expectation of privacy in an automobile is not a valid basis for excluding automobiles from the warrant requirement.” Adams, 12 St. Louis U. Pub. L. Rev. at 430, 432. Further, Professor LaFave has criticized sug *37 gestions that the degree of government regulation justifies vehicle searches. LaFave § 7.2(b), at 735 (citing Katz, 19 Am. Crim. L. Rev. at 571). What relationship does regulation of licensure, tail pipes, and headlamps have with the government’s ability to search the interior of the passenger compartment? One might reasonably expect to be stopped by law enforcement for a noisy muffler, broken tail light, or driving without a license, but does that mean a briefcase in the back of the car may be searched by police officers who make a regulatory stop? Should we not interpret article I, section 8 so that it “protects people, not places?” Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967).
Certainly the Adams-LaFave points are worthy of serious consideration. Americans take great pride in their automobiles and their use is a basic feature of modern American life. They are not used simply for transportation. Automobiles are used as temporary homes or even a place to take a snooze after a long (or not so long) drive. Bank statements, recent mail, credit card invoices, love notes, and medical information may be stored in automobiles. Glove compartments and consoles are pretty good places to keep “papers and effects.” Professionals driving home from work take bundles of documents with them in both hard and electronic formats that are often placed on the back seat. In an interesting case, a judge noted he frequently takes work home in his automobile and observed that his vehicle was thus a usual mode for transporting “drafts of opinions, notations indicating the probable outcome of submitted cases, and confidential messages from other judges.” United States v. Edwards, 554 F.2d 1331, 1338 (5th Cir.1977), vacated on other grounds 577 F.2d 883 (5th Cir.1978). Today, with new electronic devices and wireless networks, it is not unusual for an automobile to serve as a virtual office for the conduct of private business.
It is true of course, as a matter of fact, that automobiles are highly regulated. So are homes. Residents in the city have to comply with all manner of regulations. Do not burn the leaves. Take out the trash. Comply with building codes. No driveway here. Mow the lawn. Repair the sidewalk. Pipe down, for crying out loud, its 2 a.m.! Yet, these regulatory requirements do not serve as a categorical basis to defeat the warrant requirement as to the bedrooms, offices, and studies in all houses. Similarly, when an automobile is subject to registration and various regulatory requirements, these requirements at least arguably have nothing to do with your right to be “secure” in your “papers and effects” stored in the passenger compartment of the vehicle. So, maybe the regulation theory is at least subject to question.
Then, even assuming there is an automobile exception of some kind, the question arises regarding its scope. In other words, do the facts matter? Does it matter that the vehicle in this case was impounded? Which way does that cut? See, e.g., Jones v. State, 856 N.E.2d 758, 762 (Ind.Ct.App.2006) (discussing impoundment). What about a parked car when the driver is arrested? Does the state have the burden to show, under all the facts and circumstances, that obtaining a warrant was impractical? See, e.g., State v. Elison, 302 Mont. 228, 14 P.3d 456, 467-68, 471 (2000) (requiring individualized showing of exigent circumstances when driver, who was alone, was arrested and handcuffed); State v. Cooke, 163 N.J. 657, 751 A.2d 92, 100 (2000) (holding state had burden of showing both probable cause and exigent circumstances). Or, do we need a bright-line rule so bright that all automobiles are the same regardless of their use or present mobility or lack thereof? See, e.g., Moore *38 v. State, 787 So.2d 1282, 1288 (Miss.2001) (en banc) (holding automobile exception applies even to vehicles that are immobilized or unmovable). Or, does the bright-line cut the other way, in favor of no automobile exception? See, e.g., State v. Sterndale, 139 N.H. 445, 656 A.2d 409, 412 (1995) (holding there was no automobile exception under New Hampshire Constitution, thereby avoiding the “constitutional quagmire”).
Among state courts, there is a split of authority on the question of whether there is a broad automobile exception under state constitutions. See 2 Jennifer Fries-en, State Constitutional Law: Litigating Individual Rights, Claims and Defenses § 11.08, at 11-101 & n. 441 (4th ed.2006). The interesting questions regarding the validity of the automobile exception and its scope should not be resolved by a declaration that the Iowa Constitution is worded similarly to the Federal Constitution and that federal law must be followed, not with a declaration that we must follow federal law to establish uniformity, and not with a bulk citation of caselaw that supports the automobile exception. Through its neutral criteria, the dissent seeks to prevent consideration of the underlying issues described above. It is our constitutional obligation, however, to do the nitty-gritty work of examining the available authorities and precedents — both state and federal— and determining which approach makes the most sense under article I, section 8 of the Iowa Constitution. In light of the court’s disposition, that analysis will await another day.
CADY, C.J., and WIGGINS, J., join this special concurrence.

. The consistency of traffic stops with constitutional requirements has been the subject of much contemporary debate in light of the United States Supreme Court’s evolving approach. In Whren v. United States, the United States Supreme Court held that a citizen *18 could not challenge a traffic stop based upon the subjective views of a police officer. 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 97-98 (1996). Then, in Atwater v. City of Lago Vista, the United States Supreme Court held that a citizen could be arrested for a minor traffic violation. 532 U.S. 318, 354, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549, 577 (2001). Because of the scope of arrest power and the difficulty in challenging the validity of an arrest, the search-incident-to-arrest doctrine has become a controversial issue. See State v. Pals, 805 N.W.2d 767, 772-73, 775-77 (Iowa 2011); David A. Harris, The Stones, the Statistics, and the Law: Why “Driving While Black” Matters, 84 Minn. L.Rev. 265, 312-19 (1999). See generally Tracey Maclin, Race and the Fourth Amendment, 51 Vand. L.Rev. 333 (1998). The importance of the issues surrounding searches incident to arrest in the context of automobile stops is highlighted by Justice Scalia in Thornton v. United States, who observed that such searches are "legion.” 541 U.S. 615, 628, 124 S.Ct. 2127, 2135, 158 L.Ed.2d 905, 917 (2004) (Scalia, J., concurring in the judgment).

. In Tonn, this court embraced a stricter approach to search and seizure under the Iowa Constitution than federal law at the time of the decision. 195 Iowa at 104-07, 191 N.W. at 535-36. This case makes the powerful point that independent state constitutional law is neither conservative nor liberal. It simply preserves what the United States Supreme Court has referred to as our "free and unfettered” authority in interpreting our state constitution. Minnesota v. Nat'l Tea Co., 309 U.S. 551, 557, 60 S.Ct. 676, 679, 84 L.Ed. 920, 924 (1940). The Tonn court did not use criteria to depart from federal precedent, but found its approach more persuasive. 195 Iowa at 100-07, 191 N.W. at 533-36.

. The dissent quotes Tarr who summarizes arguments about legitimacy that have been raised in the past, but omits his conclusion that the concern “has largely been put to rest.” Tarr at 169.

. There is a substantial debate in the literature as to whether and the degree to which stare decisis applies to constitutional interpretation. See Jack L. Landau, Some Thoughts About State Constitutional Inteipretation, 115 *23 Penn St. L. Rev. 837, 867-68 (2011) [hereinafter Landau], As noted by Landau, some scholars say the doctrine has no application to constitutional questions, others say it has less application, and still others say it is fully applicable. Id. & nn. 113-15. Compare Gary Lawson, The Constitutional Case Against Precedent, 17 Harv. J.L. & Pub. Pol’y 23, 24 (1994) (noting that "the practice of following precedent is not merely nonobligatory, or a bad idea," it is unconstitutional), with Richard H. Fallon, Jr., Stare Decisis and the Constitution: An Essay on Constitutional Methodology, 76 N.Y.U. L. Rev. 570, 572 (2001) [hereinafter Fallon] (emphasizing stare deci-sis "is a doctrine of constitutional magnitude”). Landau asserts "in the case of state constitutional interpretation, the pull of stare decisis may not be as strong as it is in other contexts.” Landau, 115 Penn St. L. Rev. at 838. In addition, the doctrine of stare decisis is fairly complex, with a variety of theories including a "mistake approach,” a "prudential approach,” and a "special justification approach.” Steven J. Burton, The Conflict Between Stare Decisis and Overruling in Constitutional Adjudication, 35 Cardozo L. Rev. 1687, 1690 (2014) (internal quotation marks omitted). Or, as noted by Professor Fallon, "stare decisis presents constitutional puzzles.” Fallon, 76 N.Y.U. L. Rev. at 596.

. To the extent the dissent claims to prefer a strong stare decisis doctrine, such an approach would be inconsistent with the weak stare decisis employed by the United States Supreme Court in Citizens United v. Federal Election Commission. Compare 558 U.S. 310, 362-65, 130 S.Ct. 876, 912-13, 175 L.Ed.2d 753, 797-99 (2010) (overruling twenty-year-old precedent finding it was "not well reasoned”), with id. at 408-14, 130 S.Ct. at 938-42, 175 L.Ed.2d at 826-29 (Stevens, J., concurring in part and dissenting in part) (noting majority’s weak reliance on claims of stare decisis). The United States Supreme Court similarly employed weak stare decisis adherence in National Federation of Independent Business v. Sebelius. Compare 567 U.S. -, -, 132 S.Ct. 2566, 2586-91, 183 L.Ed.2d 450, 474-80 (2012) (holding the Commerce Clause does not support the individual mem-date, as the Court’s precedents describe the power as reaching only “activity,” and the individual mandate "does not regulate existing commercial activity”), with id. at -, 132 S.Ct. at 2609, 183 L.Ed.2d at 499-500 (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) (noting the majority’s "crabbed reading of the Commerce Clause ... should not have staying power”). If one were consistent, the dissent would need to apply its own criteria approach to justify its departure from these precedents.

. The dissent cites a footnote in a recent Utah case supporting its argument that we should adhere to federal precedent in interpreting parallel provisions of the Iowa Constitution. See State v. Houston, 353 P.3d 55, 76 n. 133, 2015 WL 773718, at *14 n. 133 (Utah Feb. 24, 2015). However, the citation is incomplete and gives the wrong impression. The position of the Utah court is more balanced, noting, “While we are certainly not required to adopt a federal interpretation for our state provision, we likewise are not forbidden from doing so.” Id. I agree with that statement. Cf. State v. Breuer, 808 N.W.2d 195, 197-99, 199, 201 (Iowa 2012) (declining to adopt Massachusetts approach to requirement that warrant be physically present at time of search and following approach of federal precedent). Additionally, the Utah court rejected conclusory opinions that simply adopt a different state constitutional standard without explanation or rationale. See Houston, 353 P.3d at 76 n. 133, 2015 WL 773718, at *14 n. 133. I agree with that, too. Indeed, our cases have laid out, sometimes in thorough (or excessive?) detail, why we have departed from federal precedent. See Short, 851 N.W.2d at 481-92; Baldon, 829 N.W.2d at 791-803; Pals, 805 N.W.2d at 777-84; Ochoa, 792 N.W.2d at 268-91. I also agree with the declaration by the Utah Supreme Court in State v. Tiedemann, rejecting "a formula of some kind” for adjudication of state constitutional issues. 162 P.3d 1106, 1114 (Utah 2007). As the Utah court stated:
In theory, a claimant could rely on nothing more than plain language to make an argument for a construction of a Utah provision that would be different from the interpretation the federal courts have given similar language. Independent analysis must begin with the constitutional text and rely on whatever assistance legitimate sources may provide in the interpretive process. There is no presumption that federal construction of similar language is correct.
Id. at 1115. Additionally, the dissent cites State v. Anderson, for the notion that Utah's preference is to interpret the search and seizure provision of the Utah Constitution in “accord with the Fourth Amendment.” 910 P.2d 1229, 1238 (Utah 1996). The Anderson case in turn cites State v. Watts [or this proposition; however, the Watts case notes the more nuanced approach of the Utah Supreme Court:
In declining to depart in this case from our consistent refusal heretofore to interpret article I, section 14 of our constitution in a manner different from the fourth amendment to the federal constitution, we have by no means ruled out the possibility of doing so in some future case. Indeed, choosing to give the Utah Constitution a somewhat different construction may prove to be an appropriate method for insulating this state’s citizens from the vagaries of inconsistent interpretations given to the fourth amendment by the federal courts.
750 P.2d 1219, 1221 n. 8 (Utah 1988); see Baldon, 829 N.W.2d at 830-31 (Appel, L, specially concurring) (citing inconsistencies "on the proper application of Fourth Amendment law among the Justices”).

. Ells was taking the position announced by the Wisconsin Supreme Court in In re Booth, which found that the Fugitive Slave Act violated due process under the United States Constitution. 3 Wis. 1, 41-43, 70 (1854). This outlier was overturned by the United States Supreme Court in Ableman v. Booth, 62 U.S. (21 How.) 506, 514, 526, 16 L.Ed. 169 (1858).

. The South Carolina Declaration also references the refusal of Iowa to forward murderers for prosecution, an apparent reference to the efforts of Governor Samuel Kirkwood to avoid the arrest and extradition of Barclay Coppoc, one of the participants in John Brown's raid. See Declaration of the Immediate Causes. Governor Kirkwood stalled representatives of Virginia with technicalities long enough to allow Coppoc to escape. See Soike at 165-171.

. The Iowa state historical materials may be thin in the sense that they do not directly address search and seizure issues but they are rich in another, more general sense. We know the 1857 framers, by putting the individual liberties in the first article of the Iowa Constitution, regarded them as having great importance. In addition, George Ells, Chair of the Committee on the Preamble and the Bill of Rights, declared " 'the Bill of Rights is of more importance than all the other clauses in the Constitution put together.’ " Short, 851 N.W.2d at 482-83 (quoting The Debates 103).

. More than thirty years ago, a frequently cited commentary in the Harvard Law Review noted that in considering the development of independent state constitutional law, the interests in uniformity “should seldom be a decisive factor.” Developments in the Law — The Interpretation of State Constitutional Rights, 95 Harv. L. Rev. 1324, 1395 (1982).

. See Williams v. Florida, 399 U.S. 117, 136, 90 S.Ct. 1914, 1925, 26 L.Ed.2d 446, 474 (1970) (Harlan, J., dissenting) (stating that United States Supreme Court interpretations of incorporated rights "simply reflects the lowest common denominator in the scope and function [of the Bill of Rights]”).